**Larry KURTZ, Plaintiff-Appellant,**

v.

**James F. VICKREY, Jr., individually and in his official capacity as President of the University of Montevallo, the University of Montevallo, and Martha Kirkland, Hilda Smilie, Ruth Spencer, Ann Lowery Bains, James M. Tingle, Neal Shirley, Frank C. Ellis, Paul Salter, Jr., Guy Burns, Dorothy Carmichael and James White, in their official capacities as members of the Board of Trustees of the University of Montevallo, Defendants-Appellees.**

**No. 87–7349.**

United States Court of Appeals,
Eleventh Circuit.

Sept. 19, 1988.

Joe R. Whatley, Jr., Falkenberry, Whatley & Heidt, Birmingham, Ala., for plaintiff-appellant.

Carl E. Johnson, Bishop, Colvin & Johnson, Birmingham, Ala., for defendants-appellees.

Before FAY and KRAVITCH, Circuit Judges, and ATKINS *, Senior District Judge.

KRAVITCH, Circuit Judge:

Larry Kurtz filed this action pursuant to 42 U.S.C. § 1983 alleging that he was denied promotion to full professor at the University of Montevallo for exercising (1) his right to free speech and (2) his right to access to the courts by filing a lawsuit against the university. The defendants are James Vickrey, Jr., sued both in his individual capacity and as president of the university, the University of Montevallo, and the members of the university's Board of Trustees in their official capacities. The district court granted summary judgment to defendants on the first theory; the case proceeded to trial on the second. The jury returned a special verdict, finding that although the filing of the lawsuit had been a substantial factor in the university's failure to promote Kurtz, the same decision would have been made even without Kurtz's participation in the lawsuit. The court then entered judgment for defendants. Kurtz appeals, both from the grant of summary judgment on the first theory, and from the judgment against him on the second theory.

### I.

Larry Kurtz was hired as an associate professor of mathematics by the University of Montevallo, in Montevallo, Alabama, in 1978, after having taught at Hollins College in Virginia. The University of Montevallo is within the public college system of Alabama. Kurtz was awarded tenure in the University's Department of Physics and Mathematics on May 8, 1982, effective January 1, 1983.

Kurtz has a history of tumultuous relations with the president of the university, James Vickrey, Jr., dating back as far as 1980. Kurtz characterizes his ongoing dialogue with Vickrey as relating to a "debate of great public and institutional impor-

---

* Honorable C. Clyde Atkins, Senior U.S. District Judge for the Southern District of Florida, sit- ting by designation.

tance" regarding how the university was spending public funds. In particular, Kurtz advocated public disclosure of salary levels at the university, and he argued that too much money was being spent on "window dressing" the university's physical plant, rather than on education itself. Other criticisms concerned Vickrey's personal management style—Kurtz was upset when Vickrey characterized a five percent pay increase as "good," and he was embarrassed when Vickrey reported that he had received letters from President Reagan. Additionally, Kurtz wrote to Vickrey that, contrary to Vickrey's repeated assertion, Montevallo "is *not* the geographic center" of the state, but rather is "the intersection of the diagonals of the state," although he characterized his note and Vickrey's response as a "friendly exchange."

Relations deteriorated between Vickrey and Kurtz through 1986, although Kurtz repeatedly protested that he was only trying to be helpful. In 1985, after sharply criticizing a statement from Vickrey that the "average" salary of faculty members had increased from $16,224 in 1977 to in excess of $29,300 in 1985, Kurtz published the first of two letters criticizing Vickrey's use of the term "average." In the letters, Kurtz argued that the use of the term average was misleading, illustrating his argument with the fact that his own salary, which he would consider "average," had not increased at the rate reported by Vickrey. After pointing out the discrepancy between his salary and the "average" salary, Kurtz asked, "Where is my $2000?" Several memoranda subsequently passed between the two men on the subject, but the matter was not resolved to Kurtz's satisfaction.

Several months later, in April, 1986, Kurtz participated in a lawsuit filed in the Circuit Court of Shelby County against the university by the University of Montevallo Education Association (UMEA) and eight individual faculty members. The suit sought to compel the university to

> [M]ake available information and documents showing faculty and staff salaries and related information such as time of appointment, length of contract, aca-

demic or administrative rank, and information and documents showing how salaries are determined.

The UMEA contended that it was "unable fully to represent [its] members" without the requested information.

In the spring of 1986, Kurtz applied for the fourth consecutive year to be promoted from the position of associate professor to professor. Kurtz's department head, Angela Hernandez, recommended him for promotion as she had done on his previous applications. Dean John Lott, for the first time, recommended approval of Kurtz's application, both because he believed Kurtz had improved with regard to previously identified areas of deficiency and because he believed an applicant's required showing on the matter of promotion should be less demanding with each additional year of service. The application was then forwarded to Acting Vice President of Academic Affairs Sanford Colley. Prior to Colley's consideration of the matter, Kurtz contacted Colley and questioned both his academic qualifications and his objectivity on the issue of the promotion. Colley assured Kurtz that he would be objective and subsequently recommended to Vickrey that Kurtz be promoted.

Vickrey sent a memorandum to Colley stating that he was deferring making a recommendation regarding Kurtz's promotion to the Board of Trustees. Vickrey explained that he wanted more time to review the merits of Kurtz's application, and that he desired the incoming Provost and Vice President of Academic Affairs, Robert Landen, to assist him in that regard. Vickrey also stated that he needed "to reflect further on" both the "relative paucity of evidence of scholarly activity" in recent years, and,

> the relevance, or not, of certain aspects of his behavior this academic year, including his violating UM policy by publishing the slaary [sic] of a UM faculty member (himself) *after* I warned him it'd be a violation and the totally inappropriate and thoroughly unprofessional contact he had with you and John Lott, challenging your objectivity. . . .

Vickrey concluded with a remark that he was attempting to remain as objective as possible, and that he was not going to be pushed to meet an artificial deadline on the decision. Additionally, in his deposition Vickrey explained that at that time he was not denying Kurtz a promotion, but was merely deferring consideration until he could obtain Landen's input because he believed Colley's objectivity had been tainted after Kurtz had accosted him.[1]

After Landen assumed office, he reviewed Kurtz's application package. On August 14, 1986, he sent a short memorandum to Kurtz explaining that after reviewing the application materials, he did not feel that he could support Kurtz's promotion to full professor. Several weeks later, after Kurtz had indicated that he planned to pursue a grievance on the matter, Landen sent Kurtz a more detailed letter setting forth his reasons for not recommending the promotion. He first pointed out, contrary to Kurtz's characterization of the issue, that Vickrey had not actually "denied" Kurtz a promotion, but had merely "deferred" consideration until Landen could review the application materials. Landen then explained that he personally had declined to recommend Kurtz after noting Kurtz's six year hiatus in presentations to peer groups and his four year hiatus in publications. He also stated that it appeared that much of Kurtz's "documented research activity was the product of efforts [Kurtz] made *before* [he] joined this university," and concluded that since the early part of the 1980's, Kurtz had produced little evidence of "scholarly activity open to public or professional scrutiny" nor indications of much work in progress. He recommended that Kurtz "revive the research dimension" of his career in order to become a strong candidate for full professor.

Kurtz then filed this lawsuit, alleging that appellees failed or refused to promote him because of, and in retaliation for, his rights under the first amendment. His claim had two components: (1) that he was denied promotion because of his speech, and (2) that he was denied promotion on the basis of his participation in the suit seeking to compel the university to disclose salary levels. The district court dismissed the first component of his claim before trial, finding that Kurtz's dialogue with Vickrey did not relate to matters of public concern. Kurtz's other claim—that he was denied promotion because of his participation in the lawsuit—was submitted to the jury. The jury found that although Kurtz's participation in the suit was a substantial factor in the promotion decision, the decision not to promote would have been made even if Kurtz had not participated in the law suit. Accordingly, the district court entered judgment in favor of defendants.

## II.

### A.

A determination whether a public employer has improperly sanctioned an employee on the basis of the employee's speech requires " 'a balance between the interest of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.' " *Rankin v. McPherson,* —— U.S. ——, 107 S.Ct. 2891, 2896, 97 L.Ed.2d 315 (1987) (quoting *Pickering v. Board of Education,* 391 U.S. 563, 568, 88 S.Ct. 1731, 1734–35, 20 L.Ed.2d 811 (1968); *Connick v. Myers,* 461 U.S. 138, 140, 103 S.Ct. 1684, 1686, 75 L.Ed.2d 708 (1983). A threshold question, before considering the balancing equation, is whether the employee's speech may be "fairly characterized as constituting speech on a matter of public concern"; in other words, does the speech relate "to any matter of political, social, or other concern to the community." *Connick,* 461 U.S. at 146, 103 S.Ct. at 1690.

The meaning of the term "public concern" is not without ambiguity, even given the Supreme Court's directive to determine whether an employee's speech addresses a

---

**1.** Vickrey stated, in his deposition, that he would not make a positive recommendation for a promotion to the Board unless he received such a recommendation from the Vice President.

matter of public concern by reviewing the "content, form, and context of a given statement, as revealed by the whole record." *Id.*, 461 U.S. at 147–48, 103 S.Ct. at 1690. The Court explained in *Connick* that the purpose of the "public concern" threshold test is to prevent the federal courts from becoming "a roundtable for employee complaints over internal office affairs." *Id.*, 461 U.S. at 149, 103 S.Ct. at 1691. "To presume that all matters which transpire within a government office are of public concern would mean that virtually every remark—and certainly every criticism directed at a public official—would plant the seed of a constitutional case." *Id.* As this court explained in *Ferrara v. Mills*, 781 F.2d 1508, 1516 (11th Cir.1986), "a public employee may not transform a personal grievance into a matter of public concern by invoking a supposed popular interest in the way public institutions are run."

Because of the ease with which any complaint about the management of government office could be termed a matter of public concern, some courts, in making such determinations, have focused on *Connick*'s directive to consider whether the speech at issue was made primarily in the employee's role as citizen, or primarily in the role of employee. *See Connick*, 461 U.S. at 147, 103 S.Ct. at 1690; *Callaway v. Hafeman*, 832 F.2d 414, 417 (7th Cir.1987); *Terrell v. University of Texas System Police*, 792 F.2d 1360, 1362 (5th Cir.1986), *cert. denied*, 479 U.S. 1064, 107 S.Ct. 948, 93 L.Ed.2d 997 (1987). In *Terrell* the court stated that "the mere fact that the topic of the employee's speech was one in which the public might or would have had a great interest is of little moment." *Id.* Concluding that the employee's speech, which consisted of scrutinizing notes and criticisms

of his superior written in a notebook, was not a matter of public concern, the *Terrell* court relied upon the employee's lack of efforts to communicate the contents of the notebook to the public. *See also Gomez v. Texas Dep't of Mental Health*, 794 F.2d 1018, 1022 (5th Cir.1986) ("Whatever the significance of Gomez' speech ..., he was not seeking to alert the public to any actual or potential wrongdoing or breach of the public trust...."); *Linhart v. Glatfelter*, 771 F.2d 1004, 1010 (7th Cir.1985) (*Connick* "requires us to look at the *point* of the speech in question: was it the employee's point to bring wrongdoing to light? Or to raise other issues of public concern, because they are of public concern? Or was the point to further some purely private interest?").

■ Although an employee's efforts to communicate his or her concerns to the public are relevant to a determination of whether or not the employee's speech relates to a matter of public concern, focusing solely on such behavior, or on the employee's motivation, does not fully reflect the Supreme Court's directive that the content, form, and context of the speech must all be considered.[2] The content of the speech is notably overlooked in such an analysis, although content is undoubtedly a material concern, as evidenced by the Supreme Court's decision in *Connick*, and its more recent decision in *Rankin*. Moreover, such a focus overlooks the Court's holding in *Givhan v. Western Line Consolidated School District*, 439 U.S. 410, 415–16, 99 S.Ct. 693, 697, 58 L.Ed.2d 619 (1979) that a public employee's freedom of speech is not sacrificed merely because the employee "arranges to communicate privately with his employer rather than to spread his views before the public."[3]

---

2. *See Rode v. Dellarciprete*, 845 F.2d 1195, 1201–02 (3d Cir.1988) (inappropriate for court to place complete reliance on employee's motivation for speaking; "when a public employee participates in an interview sought by a news reporter on a matter of public concern, the employee is engaged in the exercise of a first amendment right to freedom of speech, even though the employee may have a personal stake in the substance of the interview.").

3. Although *Givhan* was decided prior to *Connick*, and thus contains no discussion of the public concern threshold test, the Court's decision in *Connick* made clear that Mrs. Givhan's speech, which protested alleged racial discrimination, related to a matter of public concern. *See Connick*, 461 U.S. at 148 n. 8, 103 S.Ct. at 1691 n. 8 (explaining that racial discrimination is inherently a matter of public concern).

In *Connick*, the speech at issue consisted of a questionnaire sent by the plaintiff to her co-workers seeking their views on office transfer policy, office morale, the need for a grievance committee, the level of confidence in supervisors, and whether employees felt pressure to work in political campaigns. The Court determined that, although the first four issues did not sufficiently touch upon matters of public concern, the last—whether employees ever felt pressured to work in political campaigns on behalf of office-supported candidates—was an issue of public concern, not only because such coercion itself violates the employee's fundamental constitutional rights, but also because "there is a demonstrated interest in this country that government service should depend upon meritorious performance rather than political service." 461 U.S. at 149, 103 S.Ct. at 1691. In so deciding, the Court stressed that public employees should be free to speak out on such issues without fear of reprisal.

The Court in *Rankin* focused even more closely on the content of the employee's speech in determining that it related to a matter of public concern. The *Rankin* plaintiff, a deputy constable with purely clerical duties, heard on an office radio that there had been an attempt on the life of the President of the United States. She commented to a fellow officer, who also happened to be her boyfriend, that "if they go for him again, I hope they get him." The Court held that this statement "plainly related to a matter of public concern." 107 S.Ct. at 2897. The Court explained that the statement immediately followed a news bulletin on what certainly was a matter of heightened public interest—the attempted assassination of the President. The Court agreed with the lower courts that the statement did not amount to a threat punishable by law. It concluded that the inappropriateness of the statement was irrelevant to the determination of whether it dealt with a matter of public concern, as " '[d]ebate on public issues should be uninhibited, robust, and wide-open, and ... may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials.' " *Id.* at 2898 (quoting *New York Times Co. v. Sullivan*, 376 U.S. 254, 270, 84 S.Ct. 710, 721, 11 L.Ed.2d 686 (1964)).

In this case, the district court determined that Kurtz's expressions "relate primarily to plaintiff's *personal* concern and grievances relating to ordinary matters of internal policy which plaintiff now attempts to transform into public concerns." The court noted that most of the expressions consist of discussions with or letters to Vickrey, and that one of the few published comments, an article in the university newspaper, focused on Kurtz's personal concern about his salary, as it demanded, "Where is my $2000?"

Although we agree with the district court that a substantial portion of Kurtz's expressions related to matters not properly characterized as relating to public concern, we cannot say that all of his speech failed to meet this threshold test. Much of the battle between Kurtz and Vickrey consisted of a private dispute about how the university should best be managed. Kurtz objected to a statement by Vickrey announcing a five percent salary increase because "it was stated to look good, whereas in fact it was not good." Kurtz expressed embarrassment when Vickrey reported that he had received two notes from President Reagan, and when Vickrey reported that he was not seeking the presidency of another university. Kurtz sent a note, albeit a "friendly" one, to Vickrey indicating his dismay that Vickrey had publicly characterized Montevallo as located in the geographic center of Alabama, explaining that Montevallo was properly characterized as located at the intersection of the diagonals of the state. Furthermore, Kurtz professed to believe that Vickrey was embarrassing himself and the university by misusing and abusing the term "average" in a memorandum showing a rise in faculty salaries over an eight year period. Including two published letters, Kurtz and Vickrey exchanged at least five memoranda on this subject. The memoranda reveal not only Kurtz's concern about his own salary, but also the level of personal contempt that eventually arose between him and Vickrey.

For example, in a memorandum to Vickrey from Kurtz dated November 6, 1985, Kurtz wrote:

> I am sure that you are infinitely more qualified than I in the areas of polemics, administration, the movies, and a host of others. However, if you review my professional credentials, you shall see that I am indeed aware of that most nebulus [sic] term, "average."
>
> I can find averages not only of linear relations but of exponential and transcendental relations which very few administrators can do. I, also, know enough about "averages" to recognize when they are being misused and abused.
>
> Frankly, your statement and implication in the *Wednesday Memo* regarding the "average" salary increase from $16,500 in 1977–78 to $29,300 in 1985 is embarassing [sic], and is an insult to one's intellect.

In a memo written a week later on the same subject, Kurtz added:

> In your note you introduced the extraneous idea that I am combative. I don't think I am combative but rather quite surprised that a University President who is not knowlegeable [sic] of such matters would tell a Ph.D. in Mathematics that his arithemetical [sic] analysis is wrong, that he does not understand the meaning of the word "average", and that he would embarrass himself by publishing a letter involving such analyses. This technique you use of introducing extraneous argumentative ideas illustrates why it is difficult to have a dialogue with you on a particular subject.

Vickrey responded that the university's salary averages were computed annually in the same manner used throughout American higher education, and he suggested that if Kurtz had a "better way," he should "write it up for one of the professional journals." Obviously, much of the men's dispute, and Kurtz's speech, derived from their apparent personality conflict, a matter not of public concern. Other elements of Kurtz's expressions related to his concern about his own salary level, also not a matter of public concern.

Additionally, even Kurtz's professions of concern about the university's budget, which are in one sense a matter of public interest, must be viewed in light of the fact that although he considered himself "a participant in organizing support for disclosure of salaries," his "participation" was effected only through ad hoc discussions with people he thought would be interested, and he personally never led a delegation or approached Dr. Vickrey with a request for action. And at his deposition, when asked if he had requested anyone at the university to examine figures on the proportion of the university budget spent on the physical plant, he responded,

A. We can't get budget figures.

Q. Have you asked, sir?

A. I haven't asked.. But other people have asked.

Q. Who?

A. That is the whole point of—

Q. Who has asked, do you know?

A. Well, Jim Beal told me that we have asked.

Q. We have asked, who is we?

A. I don't know who we is. I don't know the people. But I have not asked. But people want to know where is the money going.

Kurtz's profession of public concern loses force when it is considered that he took no affirmative steps to remedy, or to inform the public at large about, the problems with which he was so gravely concerned. *Cf. Fiorillo v. U.S. Dep't of Justice,* 795 F.2d 1544, 1550 (Fed.Cir.1986) ("'the grievant's motive for releasing such generalized and objurgatory statements to the press was for personal reasons and not to inform the public of matters of general concern....'").

Other elements of Kurtz's speech, however, like the employees' speech in *Connick* and *Rankin,* do relate to matters fairly characterized as issues of public concern. A number of Kurtz's disputes with Vickrey arose out of Kurtz's concern that public dollars allocated for education were

not actually being spent for educational purposes. For instance, Kurtz complained about the proposed closing of a branch of the university. He also disagreed with the use of university funds to contribute to the purchase of a fire truck for the community. The content of his criticism of the university's spending priorities related to a matter of public concern.

Employing the test set forth in *Connick* and reiterated in *Rankin*, we believe that Kurtz's expressions such as the above are "fairly characterized" as relating to a matter of public concern. These comments are unlike those in *Ferrara v. Mills*, 781 F.2d 1508 (11th Cir.1986), where this court found a teacher's statements not to relate to a matter of public concern. The comments at issue in *Ferrara* related to the teacher's inability to govern his students (which he blamed on the school's collegiate registration system) and to his displeasure concerning teacher assignments. Here, in contrast, Kurtz's complaints were directed at matters beyond the scope of internal management. There is an indication that during the relevant period, the university was going through a "financial crisis." The financial failure of a state university certainly would be a matter of public concern. Admittedly, Kurtz never went so far as to allege that Vickrey's or the Board's management of the university amounted to a "breach of public trust," *see Connick*, 461 U.S. at 148, 103 S.Ct. at 1691, but some of his criticisms were directed at ameliorating financial problems. Accordingly, although the question is close as to whether these statements are better characterized as criticisms of internal management decisions or as relating to matters of public concern, we conclude that they may fairly be characterized as relating to matters of public concern. Therefore, summary judgment was improper.[4]

**B.**

Once a plaintiff makes the threshold showing that the speech at issue relates to a matter of public concern, the court must turn to the three step process for reviewing an employee's claim of retaliation for engaging in constitutionally protected speech. *See Holley v. Seminole County School District*, 755 F.2d 1492, 1500, *petition for reh'g denied*, 763 F.2d 399 (11th Cir.1985); *Czurlanis v. Albanese*, 721 F.2d 98, 103 (3d Cir.1983). First, the plaintiff must show that the speech at issue is accorded protection under the *Pickering* balancing test. *See Rankin*, 107 S.Ct. at 2898 ("*Pickering* next requires that we balance [the plaintiff's] interest in making [the] statement against 'the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.' " (quoting *Pickering*, 391 U.S. at 568, 88 S.Ct. at 1734–35) (footnote omitted)).[5] Then, if causation is at issue, the

---

4. We have based our conclusion on our review of the record. We are disturbed, however, at appellant's failure to specifically describe, with citations to the record, every instance of the "speech" he contends is protected. We believe that our discussion above is sufficiently clear to indicate to the district court those statements we have found to touch upon a matter of public concern. Upon remand, however, appellant should be prepared to state with precision and detail all the instances of speech that he considers to be protected. Our enumeration of such instances may not be exhaustive, and Kurtz should assert before the district court any other specific statements which sufficiently relate to matters of public concern within the framework discussed above. Mere generalizations, such as allegations that Kurtz spoke on issues of "Management of a State University," "The image of a State University," and "Political Statements made by the President of a State University" are in and of themselves not specific enough to allow a court to make a determination that an employee's speech related to a matter of public concern. As stated before, *Connick* requires a court to consider the content, form, and context of the speech in question before determining whether it relates to a matter of public concern. The details of the speech at issue must be provided in order for such a determination to be made.

5. There seems to be some confusion as to the proper terminology for this first step. In *Mt. Healthy City Bd. of Education v. Doyle*, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977), where the Supreme Court first set forth the three step process, it held that the plaintiff had the burden first of showing that his or her speech was "constitutionally protected," referring to the *Pickering* balancing test. 429 U.S. at 283–84, 97 S.Ct. at 574. Subsequently, in *Connick*, the Court enunciated the threshold requirement that the speech at issue must relate to a matter

remainder of the analytic framework set forth in *Mt. Healthy City Bd. of Education v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977), must be applied. In *Mt. Healthy,* a teacher sued the school board, contending that his contract had not been renewed because of his exercise of his first amendment rights. The district court found that the teacher's exercise of his first amendment rights had played a substantial role in the board's decision not to renew his contract, and concluded that the teacher should be reinstated. At the same time, however, the court found that other reasons not to renew the contract existed, independent of the teacher's exercise of constitutional rights.

The Supreme Court held that even if the protected conduct had played a substantial part in the board's decision not to renew, if the board would have reached the same decision even without the teacher's first amendment activity, then the board's decision would not amount to a constitutional violation justifying remedial action. "A rule of causation which focuses solely on whether protected conduct played a part,

'substantial' or otherwise, in a decision not to rehire, could place an employee in a better position as a result of the exercise of constitutionally protected rights than he would have occupied had he done nothing." 429 U.S. at 285, 97 S.Ct. at 575. Although public employees may not be treated adversely as a result of constitutionally protected behavior, the Court indicated that neither should they be placed in better position than they otherwise would have been:

A borderline or marginal candidate should not have the employment question resolved against him because of constitutionally protected conduct. But that same candidate ought not to be able, by engaging in such conduct, to prevent his employer from assessing his performance record and reaching a decision not to rehire on the basis of that record, simply because the protected conduct makes the employer more certain of the correctness of its decision.

In allocating the burdens of proof, the Court explained that initially the burden should be placed on the plaintiff to show both "that his conduct was constitutionally

---

of public concern. 461 U.S. at 147–48, 103 S.Ct. at 1690. Although the public concern threshold requirement is distinct from the *Pickering* balancing test, this circuit has stated that "whether a public employee's speech is constitutionally protected turns upon whether the speech related to matters of public concern or to matters of merely personal interest to the employee." *Ferrara v. Mills,* 781 F.2d 1508, 1512 (11th Cir. 1986). As we explained, however, in *Eiland v. City of Montgomery:*

The first inquiry under *Connick,* therefore, is to determine whether speech touches matters of public concern and is constitutionally protected solely by consideration of 'the content, form, and context of a given statement, as revealed by the whole record.' [*Ferrara,* 781 F.2d at 1513–14], *quoting Connick,* 461 U.S. at 147–48, 103 S.Ct. at 1690, 75 L.Ed.2d at 720. If speech is constitutionally protected under that test, then the court's task is to weigh the employer's interest in the efficient operation of the public office against the employee's interest in the constitutionally protected speech utilizing the *Pickering* equation. 781 F.2d at 1514.... [T]he outcome of the *Pickering* test [does not determine] whether the speech was 'constitutionally protected.' The outcome of the *Connick* public interest test determines whether speech is constitutionally

protected; the outcome of the *Pickering* balancing test determines whether the public employer's interests override the employee's interests in the constitutionally protected speech.

797 F.2d 953, 956–57 n. 4 (1986), *cert. denied,* — U.S. ——, 107 S.Ct. 3263, 97 L.Ed.2d 762 (1987). Other courts, however, refer to the *Pickering* balancing process itself, rather than the *Connick* inquiry, as determinative of whether the plaintiff's activity is constitutionally protected. *See, e.g., Czurlanis v. Albanese,* 721 F.2d 98, 103 (3d Cir.1983); *contra, Rode v. Dellarciprete,* 845 F.2d 1195, 1202 (3d Cir.1988). *Mt. Healthy* supports the use of the term "constitutionally protected" to describe the result of the *Pickering* balance, for it indicates that the *Pickering* balancing test is to be used to determine whether or not the plaintiff has met the first burden of demonstrating that the speech at issue was protected. *Mt. Healthy,* however, was decided prior to *Connick.* Because the majority opinions in *Connick* and *Rankin* do not accord a specific term to the result of the *Pickering* test, whether it be "constitutionally protected speech" or a determination whether "plaintiff's constitutionally protected speech overrides the government's interests," and because functionally, the steps are the same, we adhere to our use of terminology set out in *Ferrara.*

protected,[6] and that this conduct was a 'substantial factor'—or, to put it in other words, that it was a 'motivating factor' in the Board's decision not to rehire him." 429 U.S. at 287, 97 S.Ct. at 576 (footnote omitted). If the plaintiff carries these burdens, the defendant must show by a preponderance of the evidence that "it would have reached the same decision as to respondent's reemployment even in the absence of the protected conduct." *Id.*

Here, although a determination of whether the speech is constitutionally protected and the application of the *Pickering* balancing test are issues of law, *see Rankin,* 107 S.Ct. at 2897 n. 9, we are unable properly to apply *Pickering* because of the inadequacy of the factual record and the indefiniteness of some of Kurtz's claims of protected expression. *See supra* n. 4. Accordingly, once Kurtz has clearly stated all of the instances of speech he considers to be protected, and the district court has determined which of those sufficiently relate to matters of public concern, the court should proceed to balance "the interests of the [public employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering,* 391 U.S. 563, 568, 88 S.Ct. 1731, 1734–35, 20 L.Ed.2d 811 (1968).

▇ The district court's inquiry may be complicated if some, but not all, of Kurtz's speech relates to matters of public concern.

This circuit has recognized, based on the Supreme Court's directive in *Connick,* that because "in most instances speech of a public employee will have aspects or subjects that are worthy of paramount protection under the First Amendment, as well as aspects or subjects that are not worthy of such heightened protection," as a general rule a public employee's speech should not be separated into protected and nonprotected categories for the purposes of the *Pickering* balancing test. *Eiland v. City of Montgomery,* 797 F.2d 953, 957 (11th Cir. 1986), *cert. denied,* —— U.S. ——, 107 S.Ct. 3263, 97 L.Ed.2d 762 (1987).[7] We conclude, however, that in this case, because Kurtz's "speech" consisted of many different oral statements, memoranda, and letters published over a period of several years, it would be reasonable for the district court to separate those instances of speech which clearly do not relate to a matter of public concern from those which do for the purposes of applying the *Pickering* balancing test and presenting the causation issues to the jury under *Mt. Healthy.*

This court, in *Eiland,* determined that when an employee's speech contains only some elements that relate to matters of public concern, the employee's speech as a whole should be balanced against the employer's interests to determine "whether the employee's interests in the speech as a whole outweigh the public employer's interests." 797 F.2d at 957.[8] The court recog-

---

6. Using the *Pickering* test, as we discussed previously.

7. The employee's speech at issue in *Connick* was a survey consisting of five questions. The Court analyzed each question to determine whether it related to a matter of public concern, and determined that only one of the questions concerned a matter of public interest. Nevertheless, the Court applied the *Pickering* balancing test to the survey *as a whole,* rather than to the single question relating to a matter of public concern. 461 U.S. at 149–54, 103 S.Ct. at 1691–94.

8. The *Eiland* court relied on *Connick* and drew further support from *Berry v. Bailey,* 726 F.2d 670 (11th Cir.1984), *cert. denied,* 471 U.S. 1101, 105 S.Ct. 2326, 85 L.Ed.2d 844 (1985). As the court in *Eiland* explained:

    *Berry* involved a situation where a police officer was fired allegedly in retaliation for his speech in relation to an incident involving political supporters of the sheriff. The speech in question involved five different instances of statements made by the officer to various persons. The court observed that four of the statements in question involved the officer's failure to follow the orders of his superior, the sheriff. Those statements clearly were not protected under *Pickering.* The last statement involved critical remarks concerning a supporter of the sheriff. The court determined that "even if that remark might be constitutionally protected according to the *Pickering* test in other circumstances, in this context it was a part of a set of actions posing a threat to the disciplinary structure of [the police officer's] job," resulting in his expression not being insulated. *Id.* at 676. The court in *Berry* applied the *Pickering* balance to the police officer's speech as a whole, rather than to each component part.

nized, however, that "in the proper case speech [can] have two distinct subjects," noting that "[t]o hold otherwise ... would be to grant a license to a speaker to join two totally unrelated subjects in an effort to obtain the protective shield of the First Amendment as to the entirety of the speech." *Id.* at 958. In *Eiland,* the speech at issue consisted of one poem, which the district court found to have two principal and distinct subjects. The district court had concluded that although both subjects were matters of public concern, only one of the subjects entitled the plaintiff to relief under the *Pickering* balancing test. This court held that the district court should not have divided the poem into different subjects for the purposes of the *Pickering* balancing test, but rather should have determined whether the employee's interest in the speech *as a whole* outweighed the employer's interests.

The instant case, however, differs markedly from *Eiland* in that numerous instances of speech are contested here. Some of Kurtz's comments are not documented by written evidence, and many of them were uttered years before this lawsuit was filed. Additionally, the subjects of Kurtz's speech were varied. Accordingly, Kurtz may not use those instances of speech which on their face do not relate to matters of public concern in attempting to make his showing that his speech was a substantial or motivating factor in the university's failure to promote him. Appellees, however, if they desire, may use any such speech in attempting to show that Kurtz was dismissed for reasons other than his protected speech. Because, as stated before, we do not have a complete and specific list of all the speech that Kurtz contends relates to matters of public concern, on remand the district court should make this determination, employing our analysis from the previous discussion.

Our review of the record also indicates that there may be instances of Kurtz's speech which may be characterized as "mixed"—that is, they relate in part to issues of public concern, and partly to only private concerns. Following the mandate of *Eiland,* any such instances of speech should not be broken down into separate pieces of protected and nonprotected speech, but should rather be treated as protected speech for the purposes of the *Pickering* balance and the causation determination. In other words, when undertaking the *Pickering* balancing equation, the district court may take into account the fact that not all of the speech may have been protected. *See Eiland,* 797 F.2d at 957–58; *Connick,* 461 U.S. at 149–51, 103 S.Ct. at 1691–92 (where *one* question touched upon a matter of public concern, entire questionnaire was considered in *Pickering* balancing test).

### III.

■ Although the trial court granted summary judgment on Kurtz's claim that he was denied promotion for exercising his right to free speech, the court permitted Kurtz to go to trial on the theory that Vickrey did not recommend him for promotion because of his participation in the lawsuit against the university. At trial on this issue, appellees argued to the jury that Kurtz's participation in the suit did not motivate Vickrey to deny him the promotion. Rather, although they primarily justified denying the promotion because of Kurtz's failure to sustain research activity after he was granted tenure in 1982, they also referred to the very "speech" that Kurtz had claimed was protected—the speech which we have determined that, at least in part, related to a matter of public concern. For example, appellees presented evidence to the jury that Kurtz had challenged Vickrey on issues such as the closing of one of the university campuses and had questioned Vickrey's effectiveness.[9] Kurtz argues that a determination that this speech relates to a matter of public concern requires that we vacate the jury's finding

---

*Eiland,* 797 F.2d at 957 n. 6.

**9.** Much of Kurtz's cross-examination, however, focused on Kurtz's disagreement with Vickrey

on the "salary average" issue and on the deteriorating personal relations between the men.

that he would not have been promoted despite his participation in the lawsuit.

As stated previously, if the court determines that, under *Pickering*, Kurtz's interests in his speech outweighed those of the university, then the causation issues must be resolved by the jury as set forth in *Mt. Healthy*. Additionally, if Kurtz's interests outweigh those of appellees on the "speech" issue, the issue of whether he was denied promotion because of his participation in the suit against the university must be retried.[10] As it now stands, the jury's special verdict that Kurtz would have been denied promotion despite his participation in the lawsuit could have been based, at least in part, upon a determination that Vickrey declined to recommend promotion because of Kurtz's speech on issues of public concern. If this was in fact a basis for the jury's decision, Kurtz could have met his initial burden of proof that he was discharged because of his speech, and appellees in turn should have been accorded the opportunity to show that Kurtz would have been denied promotion even without the protected behavior. It must be remembered that the special interrogatory posed to the jury, derived from *Mt. Healthy*, is for the purpose of determining causation. If a plaintiff claims that he was denied promotion on the basis of either of two distinct forms of constitutionally protected activity, or on the basis of both forms combined, and both forms were found to be protected under both *Connick* and the *Pickering* balance test, then the questions sent to the jury must carefully delineate the two issues. In this case, for example, assuming Kurtz meets this burden under *Pickering*, the special interrogatory should ask the jury whether Kurtz was denied promotion because of his protected speech, because of his participation in the lawsuit, or because of the lawsuit and the protected speech combined. If the jury should determine that either form of protected conduct, whether separately or in combination, substantially affected the denial of promotion, it should state specifically which conduct—the speech, the lawsuit, or both—played a substantial role in appellees' decision. Then, the jury would have to decide whether appellees would have taken the same action even without the behavior in question.

## IV.

Because at least some of Kurtz's speech may be fairly characterized as relating to a matter of public concern, we VACATE the decision of the district court and REMAND for further proceedings consistent with this opinion.[11]

FAY, Circuit Judge, dissenting:

This is an unusual dissent, in an unusual case. Judge Kravitch has done an outstanding job of discussing the issues and the controlling authorities. Her analysis is complete and will be most helpful to all in handling cases of this sort in the future. My problem lies not with Judge Kravitch's framework for analysis of First Amendment cases, but with her application of the principles she has outlined to the facts of this case. For, in reviewing a case such as Professor Kurtz's, we must also keep in mind the principles that the Supreme Court has established regarding summary judgment. After considering these principles, I am convinced that Kurtz has not met his burden of articulating a triable issue.

The Supreme Court has made it very clear where the burdens lie in a summary judgment context. To overcome a motion for summary judgment, the nonmoving party bears the burden of making "a showing sufficient to establish the existence of [each] element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548,

---

10. We reject appellant's suggestion that because "defendants have not appealed, the jury's determination that Kurtz filing the lawsuit was a motivating factor in the decision not to promote him should stand." When a new jury trial of a cause of action is required we generally do not make piecemeal determinations allowing part of the original verdict to stand.

11. Because we have resolved the case in this manner, we need not address the remaining issue raised by appellant.

2553, 91 L.Ed.2d 265 (1986). The nonmoving party must not simply set forth some minimal evidence regarding the claim; the party must show that there is sufficient evidence to enable a reasonable jury to return a verdict in his or her favor. *Anderson v. Liberty Lobby*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986). Because of this, the Supreme Court has recently concluded that "the inquiry involved in a ruling on a motion for summary judgment ... necessarily implicates the substantive evidentiary standard of proof that would apply at the trial on the merits." *Id.* at 252, 106 S.Ct. at 2512.

In our recent case of *Eiland v. City of Montgomery*, 797 F.2d 953 (11th Cir.1986), *cert. denied*, — U.S. —, 107 S.Ct. 3263, 97 L.Ed.2d 762 (1987), we explained that a plaintiff attempting to prove that adverse employment action was taken due to constitutionally protected speech activities "bears the initial burden of demonstrating that his speech was protected and that it was a substantial motivating factor in his discipline. Once shown, the task under *Mt. Healthy* is then to determine whether the employer would have taken the same action notwithstanding the protected speech." *Id.* at 960. To survive the defendants' motion for summary judgment, then, Kurtz would have had to present evidence sufficient to establish the possibility that a reasonable jury could rule for him after going through this analysis.

When the district court was considering the motion for summary judgment, Kurtz first had the burden of pointing out those areas of his speech that were "constitutionally protected." He failed to do so then and he has failed to do so now. Judge Kravitch practically concedes this in footnote 4 of her opinion, in which she summarizes the state of the record and the failure of Kurtz to state with any degree of reasonable precision those instances of speech that he considers to be protected. Reversing the summary judgment "[b]ecause, as stated before, we do not have a complete and specific list of all the speech that Kurtz contends relates to matters of public con-

cern," *Kurtz, supra*, at page 733, violates the dictates of *Celotex* and *Anderson.* There is absolutely no reason for giving appellant a second chance to do what he failed to do when required by law.

The few specific comments cited by Judge Kravitch—the references to disagreements about closing a branch of the university and about a financial contribution made by the college for the purchase of a fire truck—in no way satisfies the requirements of *Rankin v. McPherson*, — U.S. —, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987), *Connick v. Myers*, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983), *Givhan v. Western Line Consolidated School District*, 439 U.S. 410, 99 S.Ct. 693, 58 L.Ed.2d 619 (1979), or *Eiland.* In his deposition, in fact, Professor Kurtz indicated that these events were unimportant even when they occurred.

This record leaves no doubt in my mind that there was simply no "constitutionally protected speech" involved in this case. However, even if, by isolating trivial remarks, one could find some, I would find that Kurtz failed to make a sufficient showing under the *Pickering* balancing test.[1] As Judge Kravitch pointed out, the application of the *Pickering* balancing test is an issue of law. "The task under *Pickering* is to balance those competing interests and to determine whether the employee's interests in the speech as a whole outweigh the public employer's interests." *Eiland*, 797 F.2d at 957 (footnote omitted). My application of that test leads me to the same conclusion as the trial judge—that the interest of the State far outweighed that of appellant whose sole motives were elevation to a full professorship and an increase in salary. Therefore, I would affirm his grant of summary judgment on this ground as well.

Finally, Professor Kurtz's own comments indicate that, even if summary judgment *was* inappropriate based on both *Connick* and *Pickering*, there is insufficient evidence of causation to enable a trial court to find for Professor Kurtz after conduct-

---

1. *Pickering v. Board of Education*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968).

**736**

ing the test outlined in *Mt. Healthy City Bd. of Education v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). The discussions of the school branch closing occurred in 1983, and the talks about the fire truck took place in 1984. Kurtz was not promoted in either year. However, that decision was made before it reached Vickrey because, as Kurtz was told, it would be very unusual for the college to promote someone that early in his or her career at the school. Kurtz stated that Vickrey did not "shun" him after the incidents of 1983 and 1984 took place. Also, Kurtz responded affirmatively to the question: "Dr. Kurtz, 1984 was insignificant as far as you are concerned in terms of your employment history here and your relationship with Dr. Vickrey; is that correct?" Deposition of Larry Kurtz at 104. Both Kurtz and Vickrey focus on other incidents that are unrelated to public concern in their discussion of the deterioration of their personal and professional relationship.

The only conclusion apparent to me is that this entire episode is a continuing dispute between two individuals, one of whom was the president of the university. The thing that surprises me most about this case is the patience demonstrated by President Vickrey over the years. The debates that Kurtz initiated—quibbles over what the word "average" means and whether or not a point is the geographic center of a state as opposed to the intersection of the diagonals of the state—were pure unadulterated nonsense. Kurtz cannot today turn that into a dispute of constitutional magnitude simply because of a few comments which, he himself declared, constituted an unimportant part of this dispute.

I would affirm the judgment of the district court in all respects.