K.W. WALLACE, Plaintiff,

v.

CITY OF MONTGOMERY,
et al., Defendants.

Civil Action No. 93–D–964–N.

United States District Court,
M.D. Alabama,
Northern Division.

July 30, 1996.

James S. Ward, W. Lewis Garrison, Jr., Birmingham, AL, David G. Flack, Brenda F. Watson, Montgomery, AL, for plaintiff.

Norman Gunter Guy, Jr., Montgomery, AL, for defendants.

## MEMORANDUM OPINION AND ORDER

DE MENT, District Judge.

Before the court is defendants City of Montgomery, R.W. Grier and J.L. Fulmer's motions for summary judgment filed January 18, 1994 and June 29, 1995. The plaintiff responded in opposition on August 28, 1995, to which the defendants replied on March 20, 1996. After careful consideration of the arguments of counsel, the relevant case law and the record as a whole, the court finds that the defendants' motions are due to be denied in part and granted in part.

## JURISDICTION

This is an action arising under the United States Constitution; therefore, jurisdiction is proper under 28 U.S.C. § 1331.[1] Personal jurisdiction and venue are uncontested.

## SUMMARY JUDGMENT STANDARD

On a motion for summary judgment, the court is to construe the evidence and factual inferences arising therefrom in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). Summary judgment can be entered on a claim only if it is shown "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). As the Supreme Court has explained the summary judgment standard:

> [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be no genuine issue as to any material fact, since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial.

*Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

The trial court's function at this juncture is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249–50, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986) (citations omitted). A dispute about a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510; *see also Barfield v. Brierton,* 883 F.2d 923, 933 (11th Cir.1989).

The party seeking summary judgment has the initial burden of informing the court of the basis for the motion and of establishing, based on relevant "portions of 'the pleadings, depositions, answers to interrogatories, and admissions in the file, together with affidavits, if any,'" that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *Celotex,* 477 U.S. at 323, 106 S.Ct. at 2552–53. Once this initial demonstration under Rule 56(c) is made, the burden of production, not persuasion, shifts to the nonmoving party. The nonmoving party must "go beyond the pleadings and by [his] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553; *see also* Fed.R.Civ.P. 56(e).

In meeting this burden the nonmoving party "must do more than simply show that there is a metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). That party must demonstrate that there is a "genuine issue for trial." Fed.R.Civ.P. 56(c); *Matsushita,* 475 U.S. at 587, 106 S.Ct. at 1356. An action is void of a material issue for trial "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita,* 475 U.S. at 587, 106 S.Ct. at 1356; *see also Anderson,* 477 U.S. at 249, 106 S.Ct. at 2511.

---

1. Section 1331 provides, "[t]he federal district courts shall have original jurisdiction of all civil actions arising under the ... laws ... of the United States." 28 U.S.C. § 1331.

## FACTS

The plaintiff, K.W. Wallace, brings this action pursuant to 42 U.S.C. §§ 1983 and 1985 seeking compensatory and punitive damages as a result of the alleged conduct by the defendants which allegedly violated the plaintiff's First Amendment rights. In this regard, the plaintiff alleges that the defendants violated his (1) First Amendment right to exercise free speech; (2) First Amendment right to associate peaceably with others; and (3) First Amendment right to petition the government for a redress of grievances. Specifically, the plaintiff complains that he was initially reassigned and then demoted from his position as district chief with the Montgomery Fire Department to the position of lieutenant, in retaliation for having exercised his First Amendment rights by appearing at a news conference conducted by the president of the Montgomery Fire Fighters Union.

The president of the union made allegations of misconduct against "higher ups" in the fire department and presented the allegations of misconduct to the district attorney of Montgomery County for investigation. The city attorney allegedly identified the "higher ups" as R.W. Grier, chief of the Montgomery Fire Department. The plaintiff further claims that this demotion and the position to which he was reassigned amounted to a constructive discharge and that the grounds asserted by the defendants for the demotion and reassignment were merely pretextual. Moreover, the plaintiff says that the defendants engaged in a conspiracy to deprive him of his First Amendment rights. *See* Pl.'s Amend.Compl.

The City of Montgomery Fire Department's jurisdiction coincides with the City's police jurisdiction and is divided into three districts. Each district is under the control of a district chief for each twenty-four hour shift. Up until his demotion, the plaintiff was, at all relevant times, the senior district fire chief. The senior district chief is third in the chain of command after the fire chief and the deputy fire chief. Attach. I, Aff. of K.W. Wallace.

The dispute in this case had its origin in 1992. In 1992, Chief Grier was appointed to the Board of Directors of Comala, a federally insured credit union. The appointment was made for the unexpired term of the incumbent who had died. Comala is the credit union for the Montgomery City–County employees and performs banking services for its members. The members of the Board of Directors are Comala credit union members. The credit union members elect members of the Board of Directors.

In October 1992, the employees of the Montgomery Fire Department received raises in pay of approximately $800 per year. However, Chief Grier received an $8,000 raise. After complaints, Mayor Emory Folmar, Mayor of the City of Montgomery, Chief Grier, Deputy Chief Fulmer and the district fire chiefs, including the plaintiff, held a meeting in January 1993. Mayor Folmar and Chief Grier offered to go before the City–County Personnel Board and obtain small pay raises for the district fire chiefs, captains, lieutenants and fire fighters who had reached the top of their pay scales.

During the same period of time, the district chiefs were taking action to get parity pay raises for fire department personnel. These included a number of the district chiefs who opposed Chief Grier serving on the Board of Directors of Comala and Mayor Folmar maintaining control of Comala. At the annual Comala members' meeting in February 1993, this group nominated Carmine Roberto, the finance officer for the Montgomery Fire Department. Carmine Roberto was subsequently elected to the Board of Directors of the Comala Credit Union replacing Chief Grier. Thereafter, Mayor Folmar called a meeting of the district fire chiefs and the following occurred:

1) Mayor Folmar stated that Chief McFarland had let the word out as to the pay system proposed.[2] Exh. B to Attach. I, Aff. of K.W. Wallace at 1 (hereafter "Tr. of Meeting").

---

**2.** The plaintiff alleges that Chief Grier released the information on the pay raises. Aff. of K.W. Wallace.

2) Mayor Folmar stated that he was going down the hall (to the City–County Personnel Board) to undo the proposed pay raises for the district chiefs. Tr. of Meeting at 2.

3) Mayor Folmar singled out Chief McFarland as the person responsible for (a) the union leader showing up at the Personnel Board hearing as to the pay raises and (b) over 125 fire fighters showing up for the vote on the firemen's representative on the Comala Board. Tr. of Meeting at 2.

4) Mayor Folmar stated that he considered that a swipe at the Fire Chief (Chief Grier) was a swipe at the Mayor. Tr. of Meeting at 4.

5) Mayor Folmar stated that he considered voting against Chief Grier for the Comala Board was an act of disloyalty. Tr. of Meeting at 4–5.

6) Mayor Folmar stated that when you slap the king (Mayor Folmar), you better kill him. Tr. of Meeting at 6.

7) As required by Mayor Folmar, all district chiefs who believed as the plaintiff that District Chief Randy McFarland was being unfairly singled out and were offended by the way that the Mayor addressed Chief McFarland, were required to raise their hand. Tr. of Meeting at 6. The plaintiff raised his hand along with five other District Fire Chiefs. Five fire chiefs did not raise their hand. Aff. of K.W. Wallace.

8) Chief Wallace made a number of other statements pertaining to the disparity of the pay raises for the line fireman and the right to vote for whomever he wanted for the Board of Directors of Comala. Tr. of Meeting at 8–11.

In addition, Mayor Folmar used strong language during the meeting indicating a strong desire to fight anyone who considered voting against Chief Grier for the Comala Board. Tr. of Meeting at 4. Also, during the period of March 16 through March 22, 1993, the union president met with a number of district fire chiefs as to the misconduct of Chief Grier and Deputy Chief Fulmer. Aff. of K.W. Wallace.

On or about March 23, 1993, the union president held a press conference on the steps of the Montgomery County Courthouse to announce that he was filing with the District Attorney of Montgomery County, Alabama, allegations of a wrongdoing by "higher-ups" of the Montgomery Fire Department and requesting that the allegations be presented to the Montgomery County Grand Jury. He also requested that the public report any misconduct of "higher-ups" to the Montgomery County District Attorney and/or the union.[3] Present at the press conference were the plaintiff, other district chiefs and other fire department personnel. The plaintiff was off duty and not in uniform. Aff. of K.W. Wallace.

Prior to the press conference, the plaintiff gave a handwritten note to Pete Wethington, president of the Montgomery Fire Fighters' Association Local 1444, containing his knowledge of alleged wrongdoings by Chief Grier. Defs' Exh. 9. The plaintiff has stated that he did not know why Mr. Wethington wanted the statement. Dep. of K.W. Wallace at 151–54.

On March 31, 1993, after the plaintiff appeared at the fire fighter's union press conference, Mayor Folmar's office allegedly received an anonymous telephone call in which the caller stated that the plaintiff was taking his fire department vehicle to his home and spending time there. See Pl.'s Exh. 2. Mayor Folmar's office instructed the fire department to investigate the substance of the anonymous phone call, and the plaintiff was immediately removed from duties on the "fire line" by Deputy Chief Fulmer and assigned an 8 a.m. to 5 p.m. position in the alarm room. The investigation began on April 5, 1993, and continued through April 21, 1993. A total of twenty-four subjects were interviewed and statements were taken from twenty of them. The defendants contend that the investigation revealed that the plaintiff had been derelict in carrying out his duties and responsibilities as a district chief and had violated many policies and rules of the Montgomery Fire Department.

**3.** The president did file the allegations with the District Attorney.

The plaintiff contends that his reassignment occurred before Deputy Chief Fulmer had any evidence that the plaintiff had violated fire department rules and regulations. Chief Fulmer could not recall in his deposition reassigning any fire department employee without having evidence that the employee had committed such a violation. Fulmer Dep. at 85.

There is no written rule mandating such a reassignment. Fulmer Dep. at 83. No other anonymous complaint was reported to have been received following the news conference and the press release. *Id.* at 99. According to Chief Grier, there has never been any adverse personnel action taken against a member of the fire department following an anonymous complaint. Grier Dep. at 108–09. Chief Grier also stated in his deposition that he "didn't appreciate" the union press conference, and it made him "mad." *Id.* at 136. Chief Grier further stated that he does not have "a good relationship" with the fire fighter's union, and according to him, the union is "always in the negative" and it only tries to "tear down." *Id.* at 99–100. Deputy Chief Fulmer stated that he was "concerned" about the press conference. Fulmer Dep. at 41.

Following an investigation by the fire department's internal affairs unit beginning on April 3, 1993, Deputy Chief Fulmer prepared a report recommending that the plaintiff be demoted two levels to the rank of lieutenant. Def.'s Exh. 12. The plaintiff allegedly used fire department vehicles for personal use, went to both his and his girlfriend's houses while on duty and delayed in arriving at a fire in 1987. This report was allegedly prepared without the plaintiff having presented his side of the story. Fulmer Dep. at 87. On April 29, 1993, Deputy Chief Fulmer conducted a departmental hearing and informed the plaintiff of the charges against him and provided him with an opportunity to say anything on his behalf. As a result of the investigation, Deputy Chief Fulmer recommended the demotion of the plaintiff to fire lieutenant and scheduled a second departmental hearing before Chief Grier on or about May 3, 1993.

On May 3, 1993, a second departmental hearing (pre-disciplinary hearing) was conducted by Chief Grier. Chief Grier informed the plaintiff of the charges against him and provided him an opportunity to say anything on his behalf. The plaintiff had his attorney with him at this hearing. *See* Def.'s Exh. 15. Chief Grier recommended the demotion and reassignment of the plaintiff to lieutenant. At the time Chief Grier met with the plaintiff to hear the plaintiff's responses to the department charges against him, Chief Grier was aware that an investigation had been conducted and that Deputy Chief Fulmer had determined that the plaintiff was guilty and recommended that he be punished. Grier Dep. at 148.

Deputy Chief Fulmer has made fifty to seventy-five disciplinary recommendations to Chief Grier. Of these, Chief Grier has only disagreed with "a couple" maybe "three or four or five." Fulmer Dep. at 75–76. In the five years that Deputy Chief Fulmer has been his deputy, Chief Grier does not recall any incident in which he failed to accept Deputy Chief Fulmer's disciplinary recommendation. Grier Dep. at 149.

The plaintiff contends that although fire department vehicles are ostensibly to be used only for official business, it is common for district chiefs to use their fire department vehicles for personal purposes so long as they do not leave their district. It is not necessary for them to obtain permission from their superiors on each such occasion. Fulmer Dep. at 14–15 & 25–26. District Chiefs could tend to personal matters while on duty without permission from a supervisor or if there was an emergency. Neither of these exceptions to the general rule regarding personal use of department vehicles were a part of the fire department's written rules or regulations. In addition, permission from a supervisor would supersede departmental rules. Grier Dep. at 168–71.

The plaintiff asserts that his home, to which he was charged with going in violation of departmental rules and regulations, is actually within the boundaries of his district. According to the plaintiff, it was an accepted practice for district chiefs to drop by their homes while on duty if their house was within their territory, and with permission, this could be done even if their home was not in

their territory. Regarding the charges that the plaintiff visited his girlfriend, the plaintiff states that her house was in a "direct line" from the downtown station to the first station in his district, and he stopped there on his way from meetings downtown.

In addition to charges regarding his use of fire department vehicles, the plaintiff was charged with "delay" in arriving at a 1987 fire on Virginia Avenue. There is no explanation as to why the department failed to take action against him for almost six years, and the plaintiff testified that Chief Grier was fully aware of this incident and had not reprimanded him about it or found him to be at fault in any way prior to the news conference mentioned herein.

The plaintiff denies that he broke any rules and regulations of the fire department. At each stage of the disciplinary process, he stated that he was not guilty of the offenses with which he was charged. According to the plaintiff, his supervisors were aware of his conduct, which they are now claiming to be violations, for ten years, and he was doing these things with their permission. It is the plaintiff's belief that the disciplinary action taken against him was a result of his participation in the union press conference. After the press conference, he was approached by several city employees who told him that his superiors were "going to get" him. The plaintiff contends that no one ever told him that his conduct, about which his superiors were aware, violated rules and regulations, until after the union news conference at the courthouse, and "that's when it became a sin." The plaintiff believes that the actions of the defendants were taken in an attempt to limit his right to freedom of association. The plaintiff also contends that Chief Grier and Deputy Chief Fulmer retaliated against other ranking officers who appeared at the news conference.

On May 11, 1993, a hearing was convened by James E. Buckalew, executive assistant to Mayor Folmar, to consider the charges against the plaintiff. The plaintiff was advised of the charges against him, and he was given an opportunity to say anything on his behalf relative to the charges. The plaintiff only stated that he was innocent of all charges. The plaintiff was also represented by an attorney at this hearing. At the conclusion of said hearing, Mayor Folmar upheld the recommendation for the demotion of the plaintiff from district chief to fire lieutenant. *See* Def.'s Exh. 18.

After Mayor Folmar upheld the recommendation, the plaintiff then appealed his demotion to the City–County Personnel Board. On May 25 and 26, 1993, the City–County Personnel Board conducted an administrative hearing concerning the charges against the plaintiff. The plaintiff was represented by counsel as was the City of Montgomery. Witnesses were called on behalf of the City to substantiate the charges, and the plaintiff's attorney was given the opportunity of cross-examination, the opportunity to present witnesses and evidence, and the opportunity to make arguments to the Personnel Board. *See* Defs' Exh. 17. The plaintiff did not testify at the hearing before the City–County Personnel Board.

On or about June 2, 1993, the Personnel Board issued a single sentence statement affirming the demotion. *See* Defs' Exh. 19. Thereafter, on or about August 11, 1993, the plaintiff commenced this action.

## DISCUSSION

### I. Preclusion

■ The court recognizes that district courts do not sit as super-personnel boards. *DiPiro v. Taft,* 584 F.2d 1 (1st Cir.1978); *see also Roper v. City of Pine Bluff,* 673 F.Supp. 329 (E.D.Ark.1987). As such, the defendants argue that the plaintiff was given an opportunity before an independently comprised City–County Personnel Board to litigate the substantive issues of the charges against him. Therefore, the defendants contend that the plaintiff is precluded from bringing this action.

In *University of Tennessee v. Elliott,* 478 U.S. 788, 106 S.Ct. 3220, 92 L.Ed.2d 635 (1986), the Supreme Court of the United States held that " '[w]hen a state agency acting in a judicial capacity ... resolves disputed issues of fact properly before it which the parties have had an adequate opportunity to litigate, federal courts must give the agen-

cy's *factfinding* the same preclusive effect to which it would be entitled in the State's courts.'" 61 F.3d at 842 (quoting *Elliott,* 478 U.S. at 799, 106 S.Ct. at 3226). Likewise, in *Gjellum v. City of Birmingham,* 829 F.2d 1056 (11th Cir.1987), the Eleventh Circuit held that "[w]here the agency acted in a judicial capacity and resolved disputed issues of fact properly before it which the parties had an adequate opportunity to litigate, a federal court in a section 1983 action may, of course, consider whether the state would give preclusive effect to the state agency factfindings and, if so, whether any additional federal preclusion requirements apply to prevent precluding relitigation of this factfinding." 829 F.2d at 1070 (citing *Elliott, supra* ). The *Gjellum* court also emphasized that *"Elliott* carefully limited its holding to state agency *factfinding." Id.* at 1068.

Here, the City–County Personnel Board did not set forth any findings of fact; rather, the City–County Personnel Board issued a single sentence statement affirming the demotion. *See* Defs' Exh. 19. While the City–County Personnel Board did affirm the plaintiff's demotion, the court is unsure of the Personnel Board's specific findings of fact because the Personnel Board only issued the single sentence statement. *See* Defs' Exh. 19. As such, there exist no specific findings of fact upon which the court can give preclusive effect. Accordingly, the court finds that the defendants' motions for summary judgment are due to be denied concerning the preclusion issue.

## II. First Amendment

■ The main thrust of this case is that retaliatory action was taken against the plaintiff for appearing at a press conference called by the firefighters union. In order for this allegation to constitute a federal cause of action, the plaintiff must establish that he engaged in protected speech or conduct and that his speech or conduct was the motivating factor behind the defendants' actions. In *Beckwith v. City of Daytona,* 58 F.3d 1554 (11th Cir.1995), the Eleventh Circuit analyzed First Amendment retaliatory discharge claims under a four-part test announced in

*Bryson v. City of Waycross,* 888 F.2d 1562 (11th Cir.1989):

> The *Bryson* test examines (1) whether the employee's speech involves a matter of public concern, (2) whether the employee's interest in speaking outweighs the government's legitimate interest in efficient public service, (3) whether the speech played a substantial part in the government's challenged employment decision, and (4) whether the government would have made the same employment decision in the absence of the protected conduct.

*Beckwith,* 58 F.3d at 1563 (citing *Bryson,* 888 F.2d at 1565–66). This analysis combines and harmonizes the holdings from the following three Supreme Court decisions: *Connick v. Myers,* 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983); *Pickering v. Board of Education,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968); and *Mount Healthy City School District v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). *See also Hatcher v. Board of Public Educ. & Orphanage for Bibb County,* 809 F.2d 1546, 1557 n. 19 (11th Cir.1987).

It is undisputed that the plaintiff did not engage in any speech at the news conference. Therefore, the question becomes whether the plaintiff's presence at the news conference constituted symbolic speech or protected conduct. Specifically, the Eleventh Circuit has stated:

> The Supreme Court, in *Spence v. Washington,* 418 U.S. 405 [94 S.Ct. 2727, 41 L.Ed.2d 842] ... (1974), set out the following test for determining whether symbolic acts constitute speech for First Amendment purposes: there must be (1) an intent on the part of the actor to convey a particularized message, and (2) circumstances surrounding the act such that the likelihood is great that the message will be understood by those who view it.

*Stewart v. Baldwin County Bd. of Educ.,* 908 F.2d 1499, 1504 (11th Cir.1990).

In *Stewart,* the plaintiff, a board of education employee, silently walked out of a mandatory employee meeting in which a referendum on new school taxes was being discussed with the superintendent. *Id.* at 1501. As a consequence, he was later terminated

and thereafter brought suit claiming that his actions had been protected under the First Amendment. *Id.* at 1502. The Eleventh Circuit affirmed the district court's denial of summary judgment.

■ The court finds that it logically follows that if the act of a lone employee in silently walking out of a meeting is protected speech, then the plaintiff's appearance with the union president at the televised press conference to address issues involving impropriety in the fire department would as well be protected. In other words, the plaintiff's appearance at the news conference was conduct "sufficiently imbued with elements of communication to implicate the protection guaranteed by the First Amendment." *Id.* at 1505 (citations omitted). Consequently, the court finds that such activity is protected by the First Amendment.

■ The plaintiff also claims that the defendants were attempting to limit his right to freedom of association. In *Hatcher v. Board of Public Educ. & Orphanage*, 809 F.2d 1546 (11th Cir.1987), the plaintiff was demoted from school principal to librarian as a result of public school reorganizations. When she was not assigned to a newly created position as principal, she brought suit under § 1983 alleging, inter alia, that she had been demoted because she engaged in activity protected by the First Amendment. *Id.* at 1548. Specifically, she claimed that the school superintendent refused to recommend her for the position because of her activities in connection with protests of the school closing plan and because she had attempted to bring her minister to a school board meeting in which her job replacement was discussed. The district court granted summary judgment for the defendants holding, in part, that the plaintiff's First Amendment rights "have in no way been violated." *Id.* at 1548. The Eleventh Circuit reversed the district court, holding that the plaintiff's rights to freedom of association had been violated. Specifically, the Eleventh Circuit noted that "associational activity is no less protected because appellant chose to add the support of her silent presence to the efforts of those who took a more active role." *Id.* at 1557. Accordingly, the court finds that the circumstances presented in this case invoke the plaintiff's right to freedom of association.

■■ The phrase "matter of public concern" has been held to "embrace a wide variety of speech directed to political, social, economic and cultural issues of substantial legitimate interest to the public." *Green v. City of Montgomery*, 792 F.Supp. 1238, 1251 (M.D.Ala.1992); *see also Maples v. Martin*, 858 F.2d 1546, 1552–53 (11th Cir.1988). Whether an employee's expression may be characterized as on a matter of public concern "must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Rankin*, 483 U.S. at 384–85, 107 S.Ct. at 2897. It seems logical that a televised news conference dealing with alleged misconduct by "higher-ups" in a city's fire department would fall within this definition.

■ Furthermore, the plaintiff also claims, as discussed *supra*, that he was the victim of retaliation as a result of his association with the union. In this regard, the Fifth Circuit has noted that "speech in the context of union activity will seldom be personal; most often it will be political speech." *Boddie v. City of Columbus*, 989 F.2d 745, 750 (5th Cir.1993); *see also Smith v. Arkansas State Highway Employees*, 441 U.S. 463, 464–65, 99 S.Ct. 1826, 1827–28, 60 L.Ed.2d 360 (1979) (the First Amendment protects an employee's right to associate with a union). Moreover, the fact that the plaintiff was not a member of the union is not dispositive of whether he associates with the union. *See De Jonge v. Oregon*, 299 U.S. 353, 57 S.Ct. 255, 81 L.Ed. 278 (1937) (finding violation of free speech and peaceful assembly because proscription was against non-member who participated or spoke on a particular subject in a public meeting called by the Communist Party). Based on the foregoing, the court finds that the first prong in the *Bryson* analysis is met.

The second factor involves whether the employee's interest in speaking outweighs the government's legitimate interest in efficient public service. " 'This balancing is necessary in order to accommodate the dual role of the public employer as a provider of public

services and as a government entity operating under the constraints of the First Amendment.'" *Stewart,* 908 F.2d at 1505 (quoting *Rankin,* 483 U.S. at 384, 107 S.Ct. at 2897). Essentially, this balancing "acknowledges that the discharge of an employee because of that employee's speech will not always be an illegal termination." *Id.* Here, given the fact that the plaintiff's "speech" was nondisruptive and given the importance of the issue of an employee's freedom to disagree with his supervisors, the court finds that the trier of fact could reasonably find that the plaintiff's interest in speaking outweighs the government's legitimate interest in efficient public service. Consequently, this issue is more appropriately a jury question.

■ The court will next address whether the protected conduct was a substantial or motivating factor in the decision to take adverse employment action against the plaintiff. *See Hatcher,* 809 F.2d at 1556; *Holley v. Seminole County School Dist.,* 755 F.2d 1492, 1500 (11th Cir.1985). The court recognizes that "proving the motivation behind official action is often a problematic undertaking." *Hunter v. Underwood,* 471 U.S. 222, 228, 105 S.Ct. 1916, 1920, 85 L.Ed.2d 222 (1985). A determination of whether a retaliatory purpose was a substantial or motivating factor behind an employment decision "demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Village of Arlington Heights v. Metropolitan Housing Dev. Corp.,* 429 U.S. 252, 266, 97 S.Ct. 555, 564, 50 L.Ed.2d 450 (1977). The Supreme Court in *Arlington Heights* listed a number of examples of circumstantial evidence of intent, including "[t]he historical background of the decision ..., particularly if it reveals a series of official actions taken for invidious purposes ... [and] [t]he specific sequence of events leading up [to] the challenged decision...." 429 U.S. at 267, 97 S.Ct. at 564.

■ The evidence, *viewed in the light most favorable to the plaintiff, as required,* reveals that the plaintiff's superiors historically did not have a good relationship with the fire fighters' union. Shortly after the plaintiff appeared at the union news conference, solely on the strength of an anonymous phone call and with no investigation, the plaintiff was reassigned to "8 to 5" status in "a cave under the alarm room ... for doing something that [he] had been doing for eleven years." Chief Grier admitted to being "mad" about the news conference, and Deputy Chief Fulmer admitted he was "concerned." The evidence also reveals that there was no written rule mandating such a reassignment. Moreover, there is evidence that the Mayor was upset about the union's actions.

■ Based on these facts before the court, the court finds that a reasonable trier of fact could find that the plaintiff's association with the union to petition the government for redress of grievances and participation in the press conference were substantial motivating factors in the decision to take action against him. As such, because disputed issues of fact exist, the court finds that the motivation for the action taken against the plaintiff is a question for the trier of fact at trial to decide, where the trier of fact can make choices as to credibility and weight of the evidence. This is particularly true in light of the Eleventh Circuit's admonition that summary judgment is particularly inappropriate in First Amendment cases where the parties dispute the employer's motivation and where it would require the court to "rely on one party's 'version of the facts' to resolve any issue in the case." *Hatcher,* 809 F.2d at 1558; *Stewart,* 908 F.2d at 1511. In fact, "[a]s a general rule, 'summary judgment is particularly inappropriate in first amendment cases.'" *Hatcher,* 809 F.2d at 1558 (quoting *Ferrara v. Mills,* 781 F.2d 1508, 1515 (11th Cir.1986)).

The fourth factor in the court's analysis requires the defendants to show by a preponderance of the evidence that the same employment decision would have been rendered in the absence of the protective conduct. *Id.* According to the plaintiff, he had been engaging in the conduct with which he was charged, with full knowledge and consent of his superiors, for ten to eleven years, and it was an accepted practice. Both Deputy Chief Fulmer and Chief Grier have stated

that it was not uncommon for district chiefs to use their fire department vehicles for personal purposes while on duty. Regarding the 1987 fire at Virginia Avenue, the City failed to take any action against the plaintiff for over five years. Moreover, the plaintiff testified that Chief Grier was fully aware of the Virginia Avenue situation and had never before found the plaintiff to be at fault. Under these circumstances, the court finds that there are genuine issues of fact as to whether the discipline would have been imposed on the plaintiff absent his participation in the news conference. Accordingly, the court finds that the resolution of the fourth factor is best left to the trier of fact at trial. In fact, the foregoing facts mentioned in relation to the fourth factor also support the court's finding that the determination of the third factor is best left to the jury.

## A. Official Capacity [4]

### 1. Individual Defendants

It is well established that "suits against an official in his or her official capacity are suits against the entity the individual represents." *Parker v. Williams*, 862 F.2d 1471, 1476 n. 4 (11th Cir.1989); *see also Monell v. Department of Social Services of City of New York*, 436 U.S. 658, 691 n. 55, 98 S.Ct. 2018, 2036 n. 55, 56 L.Ed.2d 611 (1978) (indicating that "official-capacity suits generally represent only another way of pleading action against an entity of which an officer is an agent"); *Welch v. Laney*, 57 F.3d 1004, 1007 (11th Cir.1995); *Farred v. Hicks*, 915 F.2d 1530, 1532 (11th Cir.1990). The Supreme Court of the United States has expressly extended this principle to municipalities and their officers, noting that "there is no longer a need to bring official capacity suits against local government officials

[since] local government units can be sued directly for damages and injunctive or declaratory relief." *Kentucky v. Graham*, 473 U.S. 159, 167 n. 14, 105 S.Ct. 3099, 3106 n. 14, 87 L.Ed.2d 114 (1985). Thus, the plaintiffs § 1983 claims against the officers in their official capacities are simply a reconstitution of his claims against the City of Montgomery. Given that the plaintiff has named the City of Montgomery as a defendant in this action and has raised § 1983 claims against it, his claims for § 1983 relief as to the individual in their official capacities are redundant. Therefore, the individual defendants' motions for summary judgment against them in their official capacities is due to be granted.

### 2. City of Montgomery

The plaintiff alleges that the City of Montgomery violated 42 U.S.C. § 1983, which accords private citizens recourse in the wake of constitutional deprivations carried out by individuals acting under the color of state law.[5] Specifically, the plaintiff alleges violations of his rights under the First Amendment as enforced by 42 U.S.C. § 1983.[6]

A local governing body can be sued directly under section 1983 for monetary, declaratory or injunctive relief when the alleged unconstitutional action "implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body." *Monell v. Department of Social Servs.*, 436 U.S. 658, 690, 98 S.Ct. 2018, 2036, 56 L.Ed.2d 611 (1978). Furthermore, local governing bodies may be sued for constitutional deprivations emanating from "custom" although such a custom is not the product of formal adoption via the

---

4. Because the court determines *infra* that a deprivation of due process does not exist under the circumstances presented here, the court will only address the plaintiff's official capacity suit in the First Amendment context.

5. Section 1983 provides in relevant part that:

"[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subject-

ed, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution ... shall be liable to the party injured...."
42 U.S.C. § 1983.

6. The Fourth Amendment provides in pertinent part that "[t]he right of the people to be secure in their persons ... against unreasonable searches and seizures shall not be violated."

body's official decision-making regime.[7] *Id.* at 690–91, 98 S.Ct. at 2035–36.

However, a § 1983 plaintiff cannot rely on a theory of respondeat superior to hold a city liable for the individual actions of its police officers. *Monell,* 436 U.S. at 691, 98 S.Ct. at 2035–36; *Hearn v. City of Gainesville,* 688 F.2d 1328, 1334 (11th Cir. 1982). Neither can a municipality be held liable "solely because it employs a tortfeasor." *Busby* 931 F.2d 764, 776 (quoting *Monell,* 436 U.S. at 691, 98 S.Ct. at 2036). In order to recover against a city or municipality, a plaintiff must demonstrate that the alleged constitutional deprivation occurred pursuant to a custom or policy of the municipality. *Monell,* 436 U.S. at 694, 98 S.Ct. at 2037–38; *Gilmere v. City of Atlanta,* 774 F.2d 1495, 1503 (11th Cir.1985), *cert. denied,* 476 U.S. 1115, 106 S.Ct. 1970, 90 L.Ed.2d 654 (1986); *Hearn,* 688 F.2d at 1334. In other words, there must be a causal connection between the City of Montgomery's responsibility and the plaintiff's purported injuries. *Parker,* 862 F.2d at 1477 (citing *Monell,* 436 U.S. at 690, 98 S.Ct. at 2035–36).

The court recognizes that one way to establish the existence of a policy or custom sufficient to impose § 1983 liability on a municipal government is to show that the individuals, from whose actions liability arises, have final decision-making authority. *See Pembaur v. City of Cincinnati,* 475 U.S. 469, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986). The following succinctly summarizes the law concerning this area:

> At some level in [a] [c]ity's bureaucracy there must be officials whose acts reflect [c]ity policy. Because [a] [c]ity acts through its agents, municipal liability under § 1983 attaches to actions taken pur-

suant to the decision of a policymaker. *Reed v. Village of Shorewood,* 704 F.2d 943, 953 (7th Cir.1983). And a policymaker is one with the authority or responsibility for establishing final government action. *Pembaur v. City of Cincinnati,* [475] U.S. [469], [480–81] 106 S.Ct. 1292, 1299 ... [89 L.Ed.2d 452] (1986). Thus, municipal liability attaches "where—and only where—a deliberate choice to follow a course of action is made from among various alternatives by the official responsible for establishing final policy with respect to the subject matter in question." *Id.*

*Pollard v. City of Chicago,* 643 F.Supp. 1244, 1252 (N.D.Ill.1986).

In *City of St. Louis v. Praprotnik,* 485 U.S. 112, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988), a plurality of the Supreme Court of the United States concluded that the determination of whether a person has final decision-making authority in a particular area is a question of state law for the judge to decide, not a question of fact for the jury to resolve. *Id.* at 123. Thereafter, in *Jett v. Dallas Independent School District,* 491 U.S. 701, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989), a majority of the Supreme Court endorsed the *Praprotnik* position and held that the determination of who has final decision-making authority is to be based on state law. *Id.* at 737–38, 109 S.Ct. at 2723–24.

The court finds that the plaintiff's allegations satisfy the foregoing requirements set forth in *Pollard.* Specifically, the Mayor's instructions as to personnel matters could be deemed to be city policy. *See, e.g., City of Brighton v. Gibson,* 501 So.2d 1239 (Ala.Civ.App.1987). Moreover, the plaintiff has presented evidence that the investigations were supervised by the plaintiff's superiors who had bad relations with the fire

---

7. In *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970), the Supreme Court of the United States stated:

> Congress included customs and usages [in section 1983] because of the persistent and widespread discriminatory practices of state officials.... Although not authorized by written law, such practices of state officials could well be so permanent and well settled as to constitute a 'custom or usage' with the force of law. *Id.* at 167–68, 90 S.Ct. at 1613. As the Supreme Court has further explained,

> [i]t would be a narrow conception of jurisprudence to confine the notion of 'laws' to what is found written on the statute books, and to disregard the gloss which life has written upon it. Settled state practice ... can establish what is state law.... Deeply embedded traditional ways of carrying out state policy ... are often tougher and truer law than the dead words of the written text.

*Nashville, C. & St. Louis R. v. Browning,* 310 U.S. 362, 369, 60 S.Ct. 968, 972, 84 L.Ed. 1254 (1940).

fighters union and who were "mad" and "concerned" about the news conference. In fact, there is evidence that other individuals used their assigned vehicles during non-fire department activities and were not investigated until they provided statements to be presented to the Montgomery District Attorney. In addition, there is evidence indicating that another supervisor used his fire department vehicle during non-fire department activities while on duty but was never investigated. *See* Attach. XIII to Pl.'s Supp.Memo.Br. As such, the court finds that the plaintiff has set forth evidence that the policy was the moving force of the alleged constitutional violation.

Moreover, the courts finds it noteworthy to mention that notice pleading is sufficient for § 1983 suits against local governments.[8] *Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit,* 507 U.S. 163, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993). It is abundantly clear to the court that the complaint satisfies the notice pleading requirement. Based on the foregoing, the court finds that the defendants' motion for summary judgment on the plaintiff's § 1983 claim alleging a violation of the First Amendment against the City is due to be denied.

### B. Individual Immunity

Chief Grier and Deputy Chief Fulmer also argue that even if evidence exists which supports a First Amendment violation, they are still entitled to qualified immunity, which extinguishes liability for any and all claims against them in their individual capacity.[9] The plaintiff can avoid summary judgment on the qualified immunity issue by demonstrating either that the defendants are not entitled to immunity as a matter of law or that there exists a genuine issue of material fact as to this question of law. *Rich v. Dollar,* 841 F.2d 1558 (11th Cir.1988).

A § 1983 litigant must overcome the onerous burden of defeating the qualified immunity defense in order to recover monetary damages from the pocket of a govern-

ment official. The basis of the qualified immunity defense is firmly established:

> When a plaintiff sues a municipal officer in the officer's individual capacity for alleged civil rights violations, the plaintiff seeks money damages directly from the individual officer. If sued "individually," a municipal officer may raise an affirmative defense of good faith, or "qualified," immunity.

*Swint v. City of Wadley,* 51 F.3d 988, 994 (11th Cir.1995) (quoting *Busby v. City of Orlando,* 931 F.2d 764, 772 (11th Cir.1991)). In fact, based upon the case law in this circuit, perhaps a more appropriate name for this defense would be "unqualified immunity." The issue of whether the defendants are entitled to qualified immunity may be properly determined on a pretrial motion for summary judgment under Rule 56 of the *Federal Rules of Civil Procedure.*

For the plaintiff to defeat the defendants' motion for summary judgment based on qualified immunity, he must show that the defendants are not entitled to qualified immunity as a matter of law or that genuine issues of material fact exist so that the determination of whether the defendants are entitled to qualified immunity is only properly determined after findings of fact have been made by the jury. *Rich v. Dollar,* 841 F.2d 1558, 1563 (11th Cir.1988). However, even disputes over genuine issues of material fact will not "preclude summary judgment premised on a defendant's qualified immunity if the legal norms allegedly violated were not clearly established at the time of the challenged actions." *Id.* at 1564.

The Supreme Court of the United States has held "that government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person should have known." *Rich,* 841 F.2d at 1563 (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982));

---

8. Notice pleading requires only "a short and plain statement showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2).

9. Because the court determines *infra* that a deprivation of due process does not exist under the circumstances presented here, the court will only address qualified immunity in the First Amendment context.

see also *Ansley v. Heinrich*, 925 F.2d 1339, 1348 (11th Cir.1991). Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341, 106 S.Ct. 1092, 1096, 89 L.Ed.2d 271 (1986).

The test for whether a governmental defendant is entitled to qualified immunity from liability in his or her individual capacity involves a two-step analysis, which the court will refer to as the *Zeigler* paradigm or test. A government official first must demonstrate that " 'he [or she] was acting within the scope of his [or her] discretionary authority when the allegedly wrongful acts occurred.' " *Rich*, 841 F.2d at 1563–64 (quoting *Zeigler v. Jackson*, 716 F.2d 847, 849 (11th Cir.1983)). "Once the defendant public official satisfies his [or her] burden of moving forward with the evidence, the burden shifts to the plaintiff to show lack of good faith on the defendant's part. This burden is met by proof demonstrating that the defendant public official's actions 'violated clearly established constitutional law.' " *Rich*, 841 F.2d at 1563–64 (quoting *Zeigler*, 716 F.2d at 849).

Whether applicable law was clearly established at the time of the challenged action is determined by reference to decisions of the Supreme Court of the United States, the Court of Appeals for the Eleventh Circuit and the Supreme Court of Alabama. *D'Aguanno v. Gallagher*, 50 F.3d 877, 881 n. 6 (11th Cir.1995); *Courson v. McMillian*, 939 F.2d 1479, 1498 & n. 32 (11th Cir.1991). The relevant inquiry is "fact specific," *Rodgers v. Horsley*, 39 F.3d 308, 311 (11th Cir.1994) (De Ment, J.),[10] and the plaintiff must point to a controlling case, decided before the events at issue, that establishes a constitutional violation on "materially similar" facts. *Lassiter*, 28 F.3d at 1150. As emphasized in *Lassiter*, "pre-existing law must dictate, that is, truly compel (not just suggest or allow or raise a question about), the conclusion for every like-situated, reasonable government agent that what the defendant is doing violated federal law *in the circumstances.*" *Lassiter*, 28 F.3d at 1150 (emphasis in original); *see also Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987) (holding that "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he [or she] is doing violates that right"). In other words, "[i]f case law, in factual terms, has not staked out a bright line, qualified immunity almost always protects the defendant." *Rodgers*, 39 F.3d at 311 (quoting *Post v. City of Fort Lauderdale*, 7 F.3d 1552, 1557 (11th Cir. 1993), *modified*, 14 F.3d 583 (11th Cir.1994)). The plaintiff cannot rely on "general conclusory allegations" or "broad legal truisms." *City of Fort Lauderdale*, 7 F.3d at 1557 (quoting *Barts v. Joyner*, 865 F.2d 1187, 1190 (11th Cir.), *cert. denied*, 493 U.S. 831, 110 S.Ct. 101, 107 L.Ed.2d 65 (1989)); *see also Adams v. St. Lucie County Sheriff's Dep't*, 962 F.2d 1563, 1574–75 (11th Cir.1992) (Edmondson, J., dissenting), *approved en banc*, 998 F.2d 923 (11th Cir.1993); *Muhammad v. Wainwright*, 839 F.2d 1422, 1424 (11th Cir.1987).

The evidence is undisputed that Chief Grier and Deputy Chief Fulmer were performing discretionary functions. Therefore, the court finds that the defendants have met their burden of proving that each of them

---

10. In *Rodgers*, the Eleventh Circuit reversed this court's order denying the defendants qualified immunity on a motion for summary judgment. The Eleventh Circuit's inquiry in that case demonstrates the factual depth required for determining whether the law was clearly established:

The question in this case is not whether, in general, involuntarily committed patients have a legally cognizable interest under the Fourteenth Amendment to safe conditions. They do. Instead, the question in this case, as in all qualified immunity cases, is fact specific: in May 1991, was it clearly established in this circuit that it was unconstitutional for a mental institution to fail to supervise a patient for

fifteen minutes in the smoking room when she was on close watch status for a health problem, when the institution had a history of some "sexual contact" involving patients other than plaintiff but no history of rape for the past twelve years, where a previous patient who was to be similarly monitored disappeared, apparently escaped through a bathroom window, and fell to her death on a ledge below, and where the plaintiff had never before complained of unwanted sexual contact from either the patient accused, any other patient, or any member of the staff? The answer is "NO."

39 F.3d at 311.

was acting within his official capacity during the conduct in question. The first step of the *Zeigler* paradigm having been completed, the burden of proof now shifts to the plaintiff.

██ As to the second prong of the *Zeigler* test, i.e., that the defendants' conduct violated a clearly established constitutional law, the plaintiff does not cite any case clearly establishing that Chief Grier or Chief Deputy Fulmer violated the law at the times complained herein. While the plaintiff correctly asserts that he has a First Amendment right not to be retaliated against, the qualified immunity inquiry does not stop at such an abstract level. The court simply has been unable to find any controlling cases with facts similar to those in the instant action. As such, because neither the Eleventh Circuit, the Supreme Court of the United States, nor the Supreme Court of Alabama has considered facts and circumstances which are *closely* analogous to those in the case at bar, the court finds that it is not clearly established that Chief Grier or Chief Deputy Fulmer's actions constituted a First Amendment violation. Accordingly, the court finds that Chief Grier and Chief Deputy Fulmer are entitled to qualified immunity as to the § 1983 claims asserted against them in their individual capacities.

## III. Due Process
### 1. Substantive Due Process

██ The court will next address the defendants' contention that the plaintiff's substantive due process claims pursuant to the Fourteenth Amendment are barred by *McKinney v. Pate*, 20 F.3d 1550 (11th Cir. 1994), *cert. denied*, 513 U.S. 1110, 115 S.Ct. 898, 130 L.Ed.2d 783 (1995). Therein, the Eleventh Circuit stated:

> Today, however, we hold that, in non-legislative cases, only procedural due process claims are available to pretextually terminated employees. Thus, we conclude that our prior decisions, which generated pretextually terminated employees section 1983 causes of action premised on substantive due process violations, are contrary to Supreme Court jurisprudence; to the extent they are contrary to the holding of this opinion, they are overruled.

20 F.3d at 1560; *see also Cummings v. DeKalb County*, 24 F.3d 1349, 1354 (11th Cir. 1994), *cert. denied*, 513 U.S. 1111, 115 S.Ct. 901, 130 L.Ed.2d 785 (1995) (holding that a substantive due process claim for pretextual deprivation of employment is precluded by *McKinney* ). Since all of the plaintiff's claims herein relate to his employment demotion, the court finds that such claims do not implicate substantive due process rights under the Fourteenth Amendment. Hence, the court agrees with the defendants' reading of *McKinney* and finds that to the extent any allegations of the complaint purport to raise a claim regarding the plaintiff's substantive due process rights, such claims are foreclosed and barred by *McKinney*. Consequently, the defendants' motions for summary judgment are due to be granted insofar as they relate to the plaintiff's substantive due process claims brought under the Fourteenth Amendment.

### 2. Procedural Due Process

██ In addition, the court finds that the plaintiff's procedural due process contentions brought pursuant to the Fourteenth Amendment are due to be dismissed under the authority of *McKinney* and *Narey v. Dean*, 32 F.3d 1521 (11th Cir.1994), on the ground that the State provides adequate post-deprivation remedies. In *Narey v. Dean, supra*, the Eleventh Circuit explained the effect of *McKinney* on procedural due process claims as follows:

> Where such bias is alleged, it is only the state's refusal to provide a means to correct any error resulting from the bias that would engender a procedural due process violation.... The question, therefore, is whether the state provided Narey with the means to present his allegations, to demonstrate that his demotion was pretextual, and to redress from that biased decision.... In *McKinney*, we held that the review available in the Florida courts, which have the power to review employment termination cases for due process violations, more than satisfies that requirement.

32 F.3d at 1527 (citations and internal quotations omitted).

In accordance with the foregoing instruction from the Eleventh Circuit, the court finds that the State of Alabama provides adequate post-deprivation remedies in the form of an appeal to the state circuit court and appellate courts. *See Evans v. City of Huntsville,* 580 So.2d 1323, 1325 (Ala.1991) (citing *Ex parte Greenberg,* 395 So.2d 1000, 1002 (Ala.1981) ("[State circuit] court was responsible for reviewing the record to ensure that the fundamental rights of the parties, including the right to due process, had not been violated.")); *Smith v. Folmar,* 534 So.2d 309 (Ala.Civ.App.1988); *see also Tinney v. Shores,* 77 F.3d 378, 382 (11th Cir. 1996) ("The [plaintiffs] . . . failed to state a valid procedural due process claim because they [did] not allege[ ] that Alabama law provided them with an inadequate post-deprivation remedy."). The Alabama Courts are empowered to overturn the Montgomery City–Council Personnel Board's decision to uphold the plaintiff's demotion. Accordingly, to the extent that the plaintiff's complaint sets forth procedural due process claims pursuant to the Fourteenth Amendment, the court finds that summary judgment is due to be granted.

■■■ The Supreme Court of the United States has also explained that a "tenured employee is entitled to oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story" before a state or state agency may terminate an employee. *McKinney,* 20 F.3d at 1561 (quoting *Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 546, 105 S.Ct. 1487, 1495, 84 L.Ed.2d 494 (1985)). Here, the plaintiff received written notice of the charges against him. He heard an explanation of the employer's evidence and was assisted by counsel. He also had the opportunity to present his side of the story before the Montgomery City–Council Personnel Board through witnesses, evidence and argument. Unlike the plaintiff in *McKinney,* the plaintiff here does not allege bias on the part of the Montgomery City–Council Personnel Board. Thus, not only are there adequate post-deprivation remedies, but the plaintiff also appears to have received all the process that was due under *Loudermill.*

## IV. Conspiracy

The defendants contend that the plaintiff makes only conclusory allegations regarding the defendants' involvement in a conspiracy to demote him, and therefore, summary judgment is due to be granted on such allegations. On the other hand, the plaintiff contends that there are genuine issues of material fact on the plaintiff's conspiracy claims which preclude summary judgment.

■■■ Under Alabama law, a civil conspiracy, requires "a combination of two or more individuals to accomplish an unlawful purpose or to accomplish a lawful end by unlawful means." *Nelson v. University of Alabama System,* 594 So.2d 632, 634 (Ala.), *cert. denied,* 506 U.S. 818, 113 S.Ct. 62, 121 L.Ed.2d 30 (1992). The Alabama Supreme Court has held that "a conspiracy itself furnishes no cause of action." *Allied Supply Co. v. Brown,* 585 So.2d 33, 36 (Ala.1991). Moreover, "[t]he gist of the action is not the conspiracy but the underlying wrong that was allegedly committed," *Massengill v. Malone Freight Lines, Inc.,* 538 So.2d 784, 787 (Ala.1988); *Sadie v. Martin,* 468 So.2d 162, 165 (Ala.1985) (citing *O'Dell v. State ex rel. Patterson,* 270 Ala. 236, 117 So.2d 164 (1959)), for "[i]f the underlying cause of action is not viable, the conspiracy claim must also fail." *Id.* In other words, there must be an "actionable wrong" underlying the conspiracy claim. *Griese–Traylor Corp. v. First Nat'l Bank,* 572 F.2d 1039, 1045 (5th Cir. 1978).

Because the court has found that summary judgment in favor of the individual defendants is due to be granted on all claims, the conspiracy claim also must fail. *Betts v. McDonald's Corp.,* 567 So.2d 1252, 1255 (Ala. 1990). Accordingly, the court finds that summary judgment is due to be granted as to the plaintiff's conspiracy claim.

## CONCLUSION

For the foregoing reasons, it is CONSIDERED and ORDERED:

(1) that the defendants' motions for summary judgment be and the same are hereby DENIED concerning the preclusion issue;

(2) that the defendants' motions for summary judgment be and the same are hereby GRANTED concerning the claims against the individual defendants in their official capacities;

(3) that the defendants' motions for summary judgment be and the same are hereby DENIED concerning the First Amendment claims against the City of Montgomery;

(4) that the defendants' motions for summary judgment seeking qualified immunity concerning the claims against the individual defendants in their individual capacities be and the same is hereby GRANTED;

(5) that the defendants' motions for summary judgment be and the same are hereby GRANTED regarding the plaintiff's claims of procedural and substantive due process;

(6) that the defendants' motions for summary judgment be and the same are hereby GRANTED regarding the plaintiff's allegations of a conspiracy.