**Dianne MACK, Plaintiff,**

v.

**The STATE OF ALABAMA DEPARTMENT OF HUMAN RESOURCES, et al., Defendants.**

**No. CIV.A. 00–D–1435–N.**

United States District Court, M.D. Alabama, Northern Division.

Jan. 17, 2002.

Alvin T. Prestwood, Prestwood & Associates PC, Calvin L. Williams, Volz & Williams PC, Montgomery, AL, for Plaintiff.

Sharon E. Ficquette, J. Coleman Campbell, Alabama Department of Human Resources, Legal Office, Alice Ann Byrne, State Personnel Department, Montgomery, AL, for Defendants.

### MEMORANDUM OPINION AND ORDER

DE MENT, District Judge.

Before the court is a Motion For Summary Judgment, which jointly was filed by all Defendants[1] on November 2, 2001. (Doc. No. 27.) Plaintiff Dianne Mack ("Mack") filed a Response to this Motion on December 10. (Doc. No. 33.) No further pleadings are under submission with respect to the present Motion. After careful consideration of the arguments of counsel, the relevant law, and the record as a whole, the court finds that Defendants' Motion is due to be granted.

### I. JURISDICTION AND VENUE

The court exercises subject matter jurisdiction over these claims pursuant to 28 U.S.C. §§ 1331, 1343(a)(3), 1343(a)(4) and 1367. The parties do not contest personal jurisdiction or venue.

### II. SUMMARY JUDGMENT STANDARD

When a party moves for summary judgment, the court construes the evidence and makes factual inferences in the light most

---

1. The ten named Defendants in the present matter include the following: the State of Alabama Department of Human Resources ("ADHR"); the Pike County Department of Human Resources Board ("County Board"); William Fuller, in his official capacity as Commissioner of the ADHR ("Fuller"); the Alabama State Personnel Board ("State Board"); Joe N. Dickson, Harry McMillan, John McMillan, J. Ray Warren, and Hazel Johnston Lee in their official capacities as members of the State Board ("State Board members"); and Thomas G. Flowers, in his official capacity as the Director of the Alabama State Personnel Department ("Flowers").

favorable to the nonmoving party. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). Summary judgment is entered only if it is shown "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). At this juncture, the court does not "weigh the evidence and determine the truth of the matter," but solely "determine[s] whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (citations omitted).

This determination involves applying substantive law to the pertinent facts that have been developed. A dispute about a material fact is genuine if a reasonable jury could return a verdict for the nonmoving party, based on the applicable law in relation to the evidence presented. *Id.* at 248, 106 S.Ct. 2505; *Barfield v. Brierton*, 883 F.2d 923, 933 (11th Cir.1989). The moving party bears the initial burden of establishing the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323, 106 S.Ct. 2548. If this task is satisfied, the burden then shifts to the non-moving party, which must designate specific facts remaining for trial and "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Corp. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). An action will be dismissed when the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party. *Id.* at 587, 106 S.Ct. 1348.

## III. FACTUAL BACKGROUND

Mack, an African–American female, was employed as Director of the Pike County Department of Human Resources (PCDHR) from June of 1996 until she was terminated on July 14, 2000. (Am. Compl.¶¶ 2, 6, 10.) The present action has been brought against the entities who were principally involved in Mack's termination. Without specifically stating which Defendants are the subject of each particular claim, Mack has brought the following causes of action: (1) racial discrimination under Title VII; (2) retaliation under Title VII; (3) racial discrimination in denial of equal protection under the laws; (4) retaliation for the exercise of free speech and the petitioning of grievances; and (5) denial of procedural due process. (*Id.* at 18–32.) On the basis of the following facts, Mack seeks compensatory and injunctive relief, as well as attorney's fees. (*Id.*)

In the late summer of 1999, the County Board held a town meeting whereupon members of the local community discussed the state of affairs at the PCDHR. There was a negative sentiment as to the administration of the PCDHR, so complaints were lodged with Tony Petelos, then Commissioner of the ADHR, who appointed a team to investigate these matters. (Mot. Ex. 10.) This team consisted of a number of Directors from various county DHR branches throughout Alabama, as well as a member of the State Board. (*Id.*) After "six days of intensive interviews," the team reported "the existence of serious problems" centering on Mack's exercise of authority. (*Id.*) Though some employees voiced their support for Mack, the team concluded that "the majority are demoralized, fearful, angry, frustrated, unrewarded, and uncertain of their jobs." (*Id.*) Moreover, they discovered numerous records to be missing, the existence a high employee turnover rate, and the alienation of "the pivotal leaders of the community who are vital to the success of any county office." (*Id.*)

Much of these problems, the team concluded, could be attributed to Mack's su-

pervisory skills. (*Id.*) The team insisted that Mack was "a talented, knowledgeable, and experienced social worker who has the ability to make continuing substantial and important contributions to" the ADHR, but they concluded that a supervisory role simply was not her niche. (*Id.*) Accordingly, Petelos recommended that the County Board take some remedial action. (*Id.*) The County Board asked her to accept a voluntary removal to another position, but Mack refused. (Mot.Ex. 14.) Fearing the volatility of the situation, the County Board next requested the State Board's permission to conduct an administrative hearing on the issue. (*Id.*)

The request was approved, and on October 28, 1999, the County Board sent Mack a letter notifying her that an administrative hearing was to be held with regard to "charges and evidence concerning [her] job performance and conduct." (Mot.Ex. 1.) A number of charges were raised pertaining to, inter alia, the intimidating work environment under her helm, the arbitrariness of her personnel practices, the soured relationship her office had developed with the community, the shortcomings of her job performance, and the high employee turnover rate under her tenure. (*Id.*) In all, the enumerated charges were supported with varying degrees of specificity such that they encompassed over three pages, single-spaced, essentially mirroring the report of the team that had previously investigated the PCDHR. (*Id.*) The letter stated that, subject to certain restrictions, all pertinent material to be utilized at the hearing was available to Mack upon the request of her counsel. (*Id.*) Mack was informed that, if the charges were proven, she could be subjected to suspension or termination, but that the Board would "ask the hearing officer to terminate [her] employment." (*Id.*)

Mack proceeded to seek a temporary restraining order as to the initiation of said proceeding. (Mot.Ex. 2.) The alleged basis for the injunctive relief was due process shortcomings, namely that the charges were lacking in specificity and that the ADHR was reluctant to cooperate in clarifying said charges. (*Id.*) The request also alluded to some questionable circumstances surrounding the procedures employed, as well as the motivations behind said procedures. (*Id.*) The T.R.O. was granted, though the state court judge who entered the Order did not specify the reasons for so doing. (Mot.Ex. 3.) Nonetheless, upon expiration of the Order, and the recusal of the judge who entered the Order, the County Board once again set the wheels in motion for a hearing, having addressed none of the concerns raised in Mack's request for injunctive relief. (Mot. Ex. 4, 5.) Although the new judge expressed reservations about allowing the matter to proceed, he consented upon the assurance of ALJ Jeffery Long that Mack would be permitted the opportunity to rebut after presentation of the evidence. (Mot. Ex. 6 at 2–3.)

Evidence was presented beginning on December 13, 1999, and it continued to be presented during the course of the fourteen-day hearing which ended on February 24, 2000. (*Id.* at 3.) A myriad of witnesses were called during this time, providing more than 4000 pages of transcript testimony. (Mot. Ex. 8 at 3.) ALJ Long then proceeded to synthesize and summarize all the evidence, whereupon the relevant facts were distilled and applied to the original allegations. (Mot.Ex. 6.) His summary of 176 pages was entered on July 13, 2000, and, while not all of the charges were deemed proven by the evidence, substantial charges were deemed sufficiently supported by the evidence so as to support his recommendation that Mack be terminated. (*Id.* at 165–76.) The County Board subsequently ratified the findings and terminated Mack. (Mot.Ex. 7.)

Mack immediately appealed, wherein she once again challenged the specificity of the charges on due process grounds. (Mot. Ex. 8 at 2.) Despite ALJ Long's assurance that Mack would be given the opportunity to so object after the submission of evidence, the record provides no indication as to the extent to which he carried through on the promise. Indeed, after hearing oral arguments on the issue, Chief ALJ Richard Meadows ordered that the charges be clarified and that only these were to be heard on the de novo appeal. (*Id.*) Chief ALJ Meadows believed that Mack could sufficiently rely upon the transcript of more than 4000 pages to prepare herself in the face of the newly clarified charges, thereby overcoming any due process concerns. (*Id.* at 2–7.)

After fourteen more days of hearings commencing on September 11, 2000, and concluding on October 30, wherein sixty-nine witnesses presented testimony, Chief ALJ Meadows set about his own de novo synthesis of the evidence and the allegations before him. (*Id.* at 7.) He proceeded to thoroughly analyze all evidence before him in the course of entering an eighty-two page recommendation of his own on January 29, 2001. He remarked that he was highly impressed by Mack's overall credentials, and, indeed, he agonized over the conclusion that the facts compelled him to draw. (*Id.* at 80–82.) This conclusion was that, Mack's brilliance notwithstanding, her dismissal was to be sustained, and he recommended that the State Board members act accordingly. (*Id.*) On February 21, 2001, the State Board members adopted the recommendation, and the review thereof is presently pending in the Circuit Court of Montgomery County, Alabama. (Mot.Ex. 9, 13.)

The present cause of action was initiated long before the affirmance of or even the initial entry of Mack's dismissal; the State Board members were simply joined upon Amended Complaint after the case had been removed to the present forum. (Doc. No. 10.) Indeed, Mack filed an EEOC charge in March of 2000, after the initial hearing had concluded, but prior to ALJ Long's recommendation. (Mot.Ex. 11.) In the charge, Mack alleged that during much of her tenure with the PCDHR she was met with resistance and hostility on account of her race. (*Id.*) This hostility allegedly came not only from white PCDHR employees, but also from white members of the community with ties to the PCDHR. (*Id.*) In this vein, she alleged that the former Director conspired with the white employees to sabotage the agency thereby undermining her authority. (*Id.*) As conditions faltered within the PCDHR, Mack alleges that her requests for assistance from the ADHR were denied because of her race. (*Id.*)

Additionally, her EEOC charge alleged that the local State Representative Steve Flowers introduced House Bill 456 solely as a means of removing Mack from her post, thereby satisfying his constituency. (*Id.*) Apparently the Bill would have increased County Board membership, thus establishing a white majority which might oust Mack. (*Id.*) The ADHR allegedly supported the Bill which passed in the House, but died in the Senate, due in part to Mack's efforts via the Alabama Democratic Conference. (*Id.*) It is to be noted, however, that Mack and Petelos exchanged letters on this matter, whereupon Petelos specifically expressed his opposition to the Bill and the steps he was taking in that regard. (Mot. Ex. 12.) After legislative efforts failed, Mack contends that the white employees continued their insubordination efforts, including initiating the investigation and subsequent dismissal proceedings against her. (Mot.Ex. 11.) As Mack alleged that the ADHR was complicit in these efforts, the present lawsuit was

spawned from the EEOC's approval of her right to proceed on such allegations. (*Id.*)

## IV. DISCUSSION

### A. *Title VII Claims*

#### 1. *Who was Mack's employer?*

Mack claims that she was discriminated against on the basis of race in violation of Title VII of the 1964 Civil Rights Act, as amended 42 U.S.C. § 2000e, *et seq.* This statute provides Mack a right of action against her employer, but since her Complaint blanketly asserts that Defendants violated her rights, the court must begin with a threshold determination of which Defendant is her employer for purposes of Title VII. Mack concedes that none of the individual Defendants were her employer, thereby limiting the possible candidates to the ADHR, the State Board, and the County Board. (Resp. at 17.) Included in Title VII's definition of employer are any "governmental agencies" with "fifteen or more employees." 42 U.S.C. § 2000e(a), (b). Implicit in this definition, however, is that one of these employees is the plaintiff in question.

Mack argues that each of the three entities should be construed together as a single employer given the overlap in roles and responsibilities each played as to her employment. For instance, the County Board appoints the Director, while the rules governing general employment are determined by the State Board. To further complicate matters, the ADHR oversees supervisors. Indeed, on the historical path leading up to her final termination, Mack encountered each of the respective entities to at least some degree. She was subject to an inquiry spearheaded by the ADHR which recommended to the County Board that action be taken. The County Board, in turn, initiated proceedings pursuant to the guidelines established by the State Board, and when the two ALJ's made recommendations, both the County Board and the State Board demonstrated that they could exercise the authority to act upon such recommendations. *See also* 1975 Ala.Code § 36–26–1 *et seq.* (detailing procedures and guidelines for the bureaucratic structure).

■ The Eleventh Circuit has held that, out of concerns of comity, courts are to respect the intricacy with which state governments structure their regimes; accordingly, there is to be a presumption that ostensibly distinct entities are not the same employer under Title VII. *Lyes v. City of Riviera Beach,* 166 F.3d 1332, 1344 (11th Cir.1999). Nonetheless, a plaintiff can rebut this presumption upon a showing that "one entity exerts or shares control over the fundamental aspects of the employment relationships of another entity to such a substantial extent that it clearly outweighs the presumption that the entities are distinct."[2] *Id.* at 1345. Among the factors to consider in this analysis are the interrelation of operations and the centralized control of labor operations, factors utilized by the NLRB in the context of private employers. *Id.* Indicia of control include the common law agency factors, namely, "the authority to hire, transfer, promote, discipline, or discharge; the authority to establish work schedules or direct work assignments; and the obligation to pay or train the charging party." *Id.* Also relevant in the totality of the circumstances analysis is the authority to establish "the terms, conditions and privileges of employment." *Lee v. Mobile County Comm'n,* 954 F.Supp. 1540, 1545 (S.D.Ala. 1995).

■ The court concludes that each of the three governmental entities can be re-

---

**2.** Of course, at the summary judgment stage, a plaintiff need merely show that "a finder of fact could reasonably conclude that it is clearly outweighed." *Lyes,* 166 F.3d at 1344.

garded as a single employer in the present circumstances. Both the County Board and State Board amply demonstrated their authority to discharge Mack. Moreover, although the County Board hired her, it needed to resort to guidelines established by the State Board in order to initiate disciplinary action against her. Finally, the ADHR demonstrated a sufficient level of authority in its own right when it set the present matter in motion by leading an investigation into Mack's leadership and recommending that action be taken with regard thereto. The court is satisfied that there is a sufficient degree of interrelationship between the respective entities in these circumstances to conclude that there is at least a jury question as to the issue of whether or not they were all Mack's employer for purposes of Title VII.[3].

### 2. Race Discrimination under Title VII

As alleged in her EEOC charge, Mack claims that she was discriminated against on the basis of race in violation of Title VII. In the absence of direct evidence that Defendants terminated Mack because of her race, the court applies the *McDonnell Douglas* burden-shifting analysis. *See McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Under this analysis, the initial burden is on Mack to establish a prima facie case by pointing to evidence showing that (1) she is an African–American; (2) she was qualified for the position of Director; (3) she was discharged from that position; and (4) she was ultimately replaced by a white person. *See St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 506, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993).

Success in this regard creates a presumption of discrimination which Defendants may rebut by producing evidence Mack was terminated "for a legitimate, non-discriminatory reason." *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 254, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). Upon such a showing, the presumption is rebutted, and the burden is on Mack to show that the proffered justifications were merely pretextual, with the ultimate burden of persuasion remaining at all times with Mack to prove intentional discrimination. *Id.* at 253, 101 S.Ct. 1089.

There is no question that Mack is an African–American and that, upon her termination, she was replaced by a white Director. (Resp. at 21.) The issue of contention concerns her claim that she was qualified vis à vis Defendants' rebuttal that her shortcomings as director were the sole source of her termination. At this point the *McDonnell Douglas* tests essentially converges into one discussion: the court must examine whether Defendants adequately demonstrate that Mack was not qualified for her position or whether Mack has presented sufficient evidence to demonstrate that these justifications were offered merely to mask Defendants' true motives. *Cf. Holifield v. Reno,* 115 F.3d 1555, 1562 n. 3 (11th Cir.1997) (holding that where a the issue of a plaintiff's "job performance in intertwined with the issue of whether his termination was pretextual, [his] job performance will not be examined until a later stage in the McDonnell Douglas analysis.").

■■■■ Chief ALJ Meadows synthesized more than 3000 pages of testimony in the

---

**3.** The analysis, like all agency analyses, is highly fact-intensive, and the court's conclusion should not be interpreted to stand for the proposition that such entities might always be the appropriate defendant against the charges of a disgruntled employee in the ADHR umbrella. The actions each entity played in the process was crucial to the court's determination. For example, in the event that a non-Director brings an action in the future, presumably the ADHR would not be a defendant since its involvement with the PCDHR was more directly channeled through Mack in her supervisory role.

course of drawing the following conclusions as to Mack's tenure at the PCDHR.[4] She demonstrated an "inability. to supervise and lead the employees in the office." (Mot. Ex. 8 at 26.) Under her leadership, the operation of the PCDHR "deteriorated to such an extent that the battle [against the evils accompanying poverty] in Pike County was steadily, slowly, and inexorably being lost." (*Id.* at 46–47.) Mack denied an employee's request for FMLA leave in a fashion that was "outright mean and cruel." (*Id.* at 53.) Her "management and leadership style was so abusive that long-term employees harmed themselves personally and financially just to get out of the environment." (*Id.* at 58.) While he observed that some of the findings, "standing alone would not support [Mack's] dismissal," together they provided a more than sufficient basis for concluding that Mack should be terminated. (*Id.* at 56, 80–82.) Similarly, the court concludes that these bases more than constitute legitimate and non-discriminatory reasons for Mack's termination.

Aside from the allegations as to the procedural deficiencies by which ALJ Meadows reached his conclusions, Mack never outright denies the truth of the facts upon which he relied. Rather, she merely objects to the fact that he. "essentially ignored volumes of evidence favorable to" her case. (Resp. at 6.) In support of this contention she points out that some of the witnesses who testified in her proceedings provided positive feedback as to her overall performance and that some downplayed the tendency to attribute some of the PCDHR's shortcomings directly to Mack's skills. (*Id.* at 6–7.) Moreover, she points to witnesses who elaborated upon her "significant accomplishments and the unwarranted resistance she faced" from some of her subordinates. (*Id.* at 7.) The court acknowledges that, with a handful of exceptions, employment decisions are rarely clear-cut, and that employers often need to balance an employee's positive attributes against the negative. The record indicates that only after so doing did Chief ALJ Meadows begrudgingly make his recommendation that Mack be terminated. (Mot. Ex. 8 at 80–82.)

Moreover, for purposes of Title VII, whether the ALJ properly balanced Mack's countervailing qualities really does not matter so long as race did not enter into the analysis. *See Nix v. WLCI Radio/Rahall Communications*, 738 F.2d 1181, 1188 (11th Cir.1984) ("The employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as it is not for a discriminatory reason."); *cf. Damon v. Fleming Supermarkets of Florida, Inc.*, 196 F.3d 1354, 1363 n. 3 (11th Cir. 1999) ("An employer who fires an employee under the mistaken but honest impression that the employee violated a work rule

---

4. Although preclusive effect may be accorded to state administrative findings in actions under 42 U.S.C. § 1983, Title VII plaintiffs are entitled to a trial *de novo* following an administrative hearing. *See University of Tennessee v. Elliott*, 478 U.S. 788, 797–98, 106 S.Ct. 3220, 92 L.Ed.2d 635 (1986). In deciding to terminate Mack, Defendants in the present action relied upon ALJ recommendations, the charges of which were based upon the findings of the investigative team sent by Petelos. However, the accuracy of the findings in the present context is not as important under the *McDonnell Douglas* analysis as whether De-

fendants actually relied upon such findings in terminating Mack. *See Nix v. WLCI Radio/Rahall Communications*, 738 F.2d 1181, 1188 (11th Cir.1984) ("The employer may fire an employee for ... a reason based on erroneous facts ... as long as it is not for a discriminatory reason."). The burden is hers to prove that their purported reliance was pretextual. Therefore, the court's use of the ALJ findings does not speak to their truth, but only to whether, if relied upon by Defendants, they constitute legitimate and nondiscriminatory bases for termination. Neither the rule nor the spirit of *Elliott* is thereby violated.

is not liable for discriminatory conduct."). Chief ALJ Meadows explicitly observed that "not a scintilla of evidence" supported Mack's claim "that racial discrimination was a part of motivating any person in seeking" her removal. (Mot. Ex. 8 at 69.) Of course, this conclusion is not binding upon the court, *see Univ. of Tennessee v. Elliott,* 478 U.S. 788, 796, 106 S.Ct. 3220, 92 L.Ed.2d 635 (1986) ("Congress did not intend unreviewed state administrative proceedings to have preclusive effect on Title VII claims."), but it certainly suggests that the reasoning underlying the final determination as to Mack's fate had a permissible basis. It is Mack's burden to prove otherwise.

Mack provides the court with a number of references in the proceedings as to racial tensions which existed at the PCDHR. (Resp. at 8.) But in light of the bureaucratic structure through which the termination hearings proceeded, her burden must be higher than that. If racial discrimination was the real reason for Defendants' employment decision, they might have had quite some difficulty carrying through with this plan. They would have had to have initiated the original investigation and the proceedings because of racial animosity. Mack alleges this to be the case but has provided little evidence in support thereof. However, were the conspiracy theory espoused in Mack's EEOC charge true, this also would have required that the investigation and the proceedings themselves be laden with racist motivations. Indeed, Mack would have to show that at least some of the sixty-nine individuals who testified in the hearings were not only providing untrue information, but also that they did so at the behest of Defendants. The court sees no other way to pin liability on Defendants.

Unfortunately, while Mack alleges facts basically amounting to a conspiracy in her EEOC charge, the truth remains that there is no evidence before the court in support of such a scenario. It would be an unfortunate state of affairs if the State of Alabama's administrative regime were so corruptly saturated with racism from top to bottom. Mack's EEOC charge in this regard is frighteningly plausible, but were plausibility enough to sustain a cause of action under Title VII, the courts would be overwhelmed with such cases. There may well be "something to the fact that she is of a different race," (*id.*) but without evidence to support this contention, the court must acquiesce to Defendants who have amply demonstrated legitimate reasons for her ouster. Accordingly, summary judgment is due to be granted on Mack's claim of race discrimination under Title VII.

### 3. Retaliation under Title VII

Employees who seek redress for discrimination in the workplace are provided a sanctuary such that their employer may not later seek vengeance for these steps. 42 U.S.C. § 2000e–3(a); *EEOC v. Reichhold Chems., Inc.,* 988 F.2d 1564, 1571 (11th Cir.1993). In the absence of direct evidence, Mack can establish a prima facie case of retaliation by demonstrating that (1) she engaged in statutorily protected activity; (2) she suffered an adverse employment action; and (3) there was a causal nexus between the first two factors. *Pennington v. City of Huntsville,* 261 F.3d 1262, 1266 (11th Cir.2001). Should she establish a prima facie case, the burden would then shift to Defendants to demonstrate a legitimate, non-retaliatory basis for the action. *Id.* In turn, Mack then must show by a preponderance of the evidence that Defendants' proffered justifications are merely pretextual. *Id.*

Undoubtedly Mack's termination constituted an adverse employment action. *Jordan v. Warehouse Servs.,* 81 F.Supp.2d 1257, 1269 (M.D.Ala.2000). Likewise the filing of an EEOC charge lies at the very heart of the type of activity protected un-

der Title VII retaliation provisions. *See, e.g., Smart v. Ball State Univ.,* 89 F.3d 437, 440–41 (7th Cir.1996). The only issue before the court is whether Mack's termination followed as a consequence of her having filed the EEOC charge. Mack supports this contention with the argument that Defendants were aware of her EEOC charge, and that there was "close temporal proximity between the awareness and the adverse employment action." *Farley v. Nationwide Mut. Ins. Co.,* 197 F.3d 1322, 1337 (11th Cir.1999). Certainly the charge was filed several months prior to the County Board's adoption of ALJ Long's recommendation, and while the *Farley* rule ordinarily might be sufficient to shift the burden under the *McDonnell Douglas* analysis, the present circumstances escape such an application of the general rule.

For starters, Mack has provided no evidence that Defendants ever became aware of the EEOC charge. But more significantly, by this point, Defendants had already made abundantly clear their intention to request that the ALJ recommend Mack's termination. Indeed, the entire tenor of the proceedings was an exercise in uncovering Mack's fitness for employment. Moreover, the letter giving notice of the termination proceedings was sent five months prior to Mack's EEOC charge. The only steps taken by Defendants subsequent to Mack's protected activity were the formal adoption of the ALJ recommendations. The facts indicate that such adoption was a foregone conclusion long before the EEOC charge was filed, and Mack has provided the court with no reason to believe otherwise. As such, she has not established a prima facie case of retaliation.

She also argues, however, that an additional complaint was filed with the EEOC in August of 1999, right around the time of the first town hall meeting. (Resp. at 22.) No record of any such complaint appears in the record beyond the testimony of an EEOC agent in Mack's initial termination hearing. (DHR Tr. 3107–09.) From such testimony the court cannot infer the substance of the complaint or why the EEOC did not investigate the matter. Nor is it clear whether the complaint was filed in response to the town meeting or if it prompted the meeting. If the latter was the case, it certainly gives rise to the possibility that the County Board called the meeting in retaliation of the complaint. However, the only facts from which the court might infer that Mack lodged a complaint in the first place are because of the meeting. This confusion could have been obviated had Mack offered the alleged complaint into evidence rather than rely upon the ambiguous testimony of an EEOC agent in an unrelated proceeding. Nonetheless, even were this sufficient to establish a prima facie case of retaliation, the burden would shift to Defendants to demonstrate a legitimate basis for the termination. The ALJ recommendations based upon the testimony of sixty-nine witnesses more than amply show such a basis. As Mack cannot show that such recommendations were pretextual, her retaliation claims cannot proceed before a jury. Summary judgment is due to be granted on the retaliation claim.

### B. *Constitutional Claims* [5]

#### 1. *Who is a proper Defendant under the Constitutional Claims?*

■ As with the Title VII claims, the court must begin its discussion of Mack's constitutional claims with a determination as to which Defendants are subject to

---

5. Although the three constitutional claims were brought pursuant to both 42 U.S.C. § 1981 and 42 U.S.C. § 1983, the court finds that the claims alleging race discrimination are due to be merged into a single cause of action under Section 1983. *See Godby v.*

these claims. Because of sovereign immunity under the Eleventh Amendment, the individual Defendants sued in their official capacity may be held liable for injunctive relief only. *See Kentucky v. Graham,* 473 U.S. 159, 166, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985). Moreover, the Eleventh Amendment bars Section 1983 suits against state agencies altogether. *See Pennhurst State School and Hospital v. Halderman,* 465 U.S. 89, 100, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984). Mack concedes that the ADHR and the State Board are state agencies but contends that the PCDHR is a local government entity; in their joint Motion, Defendants sidestep the issue citing only the general rule as to the Eleventh Amendment.

 The Eleventh Circuit has held that the test used to distinguish a local government entity which may be subjected to a Section 1983 damages action, *see Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), and a state agency which is not subject to suit whatsoever, involves an examination of state law. *Hufford v. Rodgers,* 912 F.2d 1338, 1341 (11th Cir.1990). Specifically, the court is

to examine (1) how state law defines the entity in question; (2) what degree of control the state maintains over the entity; (3) where funds for the entity are derived; and (4) who is responsible for judgment against the entity. *Id.* In determining that the three governmental entities can be construed as a single employer for purposes of Title VII, the court emphasized the level of control the State Board exercised over the County Board and to the fact that the PCDHR is funded by the state. Indeed, the court finds curious that just two paragraphs before arguing the single employer theory that Mack baldly asserts that the County Board is a local government agency. (Resp. at 17–18.) The court finds that insofar as the County Board is established under the umbrella of the ADHR pursuant to state statute and that its internal practices are mandated by the State Board, it is a state agency and is not subject to suit under Section 1983.

### 2. Equal Protection

Mack alleges racial discrimination in violation of her guarantees of equal protection under the Fourteenth Amendment.[6] As

---

*Montgomery Co. Bd. of Educ.,* 996 F.Supp. 1390, 1411 (M.D.Ala.1998); *see also Butts v. County of Volusia,* 222 F.3d 891, 893 (11th Cir.2000) (observing that " § 1983 constitutes the exclusive remedy against state actors for violations under § 1981"). Of course, this conclusion is true only with respect to the Equal Protection claim since Section 1981 is concerned with race discrimination. However, Mack also purports to bring her First Amendment and Due Process claims under both Sections 1981 and 1983. To put it bluntly, there is no such thing as a Section 1981 claim under the latter two constitutional provisions. As such, the court will construe said counts solely as Section 1983 claims.

6. Her complaint also alleged a right to equal protection under the Alabama Constitution, but Defendants accurately point out that no such explicit right exists according to the lengthy discussion by the Supreme Court of

Alabama in the case of *Ex Parte Melof,* 735 So.2d 1172 (Ala.1999). At the outset of her Response, Mack directs the court's attention to *Mobile County Gas District v. Mobile Gas Service Corp.,* 284 Ala. 664, 227 So.2d 565 (1969), wherein the Supreme Court of Alabama observed the requirement that "administrative rulings be consistent," but that holding's basis appeared to find root in the Due Process Clause of the United States Constitution. *Id.* at 571. Not only has the deadline long since passed for Mack to yet again amend her complaint, after referencing said case in a footnote at the outset of her brief, she made no further steps toward an argument in this area. Regardless, while a Section 1983 claim is the proper avenue for violations of federal law, it cannot be used to remedy violations of state constitutions. Accordingly, the following discussion will pertain solely to the Equal Protection Clause of the Fourteenth Amendment.

with claims for employment discrimination under Title VII, racial discrimination claims brought pursuant to Section 1983 are analyzed in accordance with the *McDonnell Douglas–Burdine* burden-shifting test. *Busby v. City of Orlando*, 931 F.2d 764, 777 (11th Cir.1991). Indeed, "because the elements of a public sector employment discrimination case are the same under both Title VII and Section 1983," the court's Title VII analysis above is equally applicable to the present discussion. *Moore v. Alabama*, 989 F.Supp. 1412, 1421 (M.D.Ala.1997), *aff'd*, 178 F.3d 1303 (11th Cir.1999). The fact that different named Defendants are involved in each cause of action prevents the court from immediately arriving at the same conclusion, but only to the extent that Mack has presented incriminating evidence as to the individual Defendants, above and beyond that involved in the Title VII discussion. Because no such evidence is before the court, it concludes that summary judgment is likewise due to be granted on Mack's Equal Protection claim.

### 3. First Amendment Retaliation

■ Mack's Amended Complaint also alleges that the Defendants initiated her termination proceedings in retaliation for her decision to "exercise ... her rights to free speech and to petition the government for the redress of grievances." (Am. Compl.¶ 28.) It is well settled that a state cannot condition public employment on a basis that infringes the employee's right to free exercise as protected by the First Amendment. *Keyishian v. Bd. of Regents*, 385 U.S. 589, 605–06, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967). A corollary of this

general proposition is that the state employer may not "demote or discharge a public employee in retaliation for" having exercised said right. *Morgan v. Ford*, 6 F.3d 750, 753–54 (11th Cir.1993).

The Eleventh Circuit has established a four-part test for evaluating whether a state employer engaged in such unconstitutional activity. *Id.* at 754. First, Mack must show she made a statement that can be "fairly characterized as constituting speech on a matter of public concern." *Id.* (internal quotations omitted). If she satisfies this burden, the court is to weigh her First Amendment interests against Defendants' interest in "promoting the efficiency of the public services it performs through its employees." *Id.* (internal quotations omitted). Should the court find Mack's relative interests to bear sufficient weight, it must examine whether or not her statements played a "substantial part" in Defendants' decision to terminate her. *Id.* (internal quotations omitted). An affirmative finding in this regard shifts the burden to Defendants to prove by a preponderance of the evidence that they would have terminated her even had she not engaged in protected conduct. *Id.*

■ As an initial matter, the court observes that Mack's Amended Complaint does not allude to any specific statements she ever made which might constitute protected speech under the First Amendment. In the pending Motion, Defendants assume it was the complaint Mack lodged with then-ADHR Commissioner Petelos, voicing her opposition to the proposed legislation which might cost Mack her job.[7] However, the Eleventh Circuit has drawn a dis-

---

7. It is worth mentioning that Steven Flowers, the former state legislator who proposed H.R. Bill 456, was called as a witness in Mack's termination proceeding. (Mot. Ex. 8 at 66–69.) When he testified, he candidly admitted that the Bill was introduced with the sole objective of changing the constituency of the County Board so that Mack would be ousted.

(*Id.* at 68.) He adamantly denied that Mack's race was a factor, insisting that he merely wanted to remove her to satisfy his disgruntled constituency. (*Id.*) However, he also remarked that this method seemed the best way to save face among his African–American constituency lest he be perceived as acting unfairly. (*Id.*)

tinction between "whether the speech at issue was made in the employee's role as citizen or as employee." *Deremo v. Watkins*, 939 F.2d 908, 910 (11th Cir.1991). It is not clear that Mack's complaint readily classifies as a matter of public concern inasmuch as Mack's complaints undeniably were motivated by self-interest, namely her own job security. *See id.* at 911 (observing that "the employee's motivation in speaking" is a relevant factor in determining whether the statement is of public concern). Nonetheless, Mack was speaking out about legislation aimed directly at her, and the court concludes that maintaining an open process by which to protect oneself in the democratic system is fundamental to First Amendment protections. *See generally* C. Edwin Baker, *Human Liberty and Freedom of Speech* 225–49 (1989). Likewise, the fact that the legislative process tends to operate in such a manner undoubtedly concerns all members of the electorate, and citizens should be encouraged to so inform the electorate.[8] *Id.* Accordingly, the court concludes that Mack's complaint constitutes a matter of public concern.

In her Response, Mack also alludes to "utterances or positions" she took pertaining to the "effective operation" of the PCDHR. (Resp. at 23.) Examples allegedly include her insistence "upon the correct accounting and control of a 'donated fund' of money to the agency," and her

expression of "considerable concern over . . . a missing bank deposit of child support money." (*Id.*) The court notes the difficulty in making a determination as to whether such statements constitute matters of public concern when there is no evidence as to the specific substance of the statements. Nonetheless, even granting Mack more leeway than arguably permitted under the Federal Rules of Evidence, *cf. Kurtz v. Vickrey*, 855 F.2d 723, 730 n. 4 (11th Cir.1988) (criticizing employee's failure to provide specific evidence of the speech in question, but nonetheless concluding that they touched "upon a matter of public concern"), her positions and utterances simply cannot be characterized as matters of public concern.

Mack's positions concern various approaches to the internal administration of the PCDHR. In *Kurtz*, the Eleventh Circuit held that a professor's letter to the university administration pertaining to intra-office personality conflicts did not constitute matters of public concern, but it held that one pertaining to the university's use of public funds did. *Id.* at 728–30. Akin to the latter example, Mack proposes the following train of logic: insofar as the steps taken internal to the PCDHR have a grave impact on the manner in which the PCDHR serves the community, any comments made concerning these steps necessarily implicate the public interest. (Resp. at 23.) The court refuses to climb aboard.[9]

---

8. The analysis is not altered simply because Mack voiced the complaint to Petelos rather than the public at large. *See Givhan v. W. Line Cons. Sch. Dist.*, 439 U.S. 410, 415–16, 99 S.Ct. 693, 58 L.Ed.2d 619 (1979) ("[T]he 'freedom of speech' . . . is not lost to the public employee who arranges to communicate privately with his employer rather than to spread his views before the public.").

9. The Supreme Court explicitly has downplayed this line of thinking:

> To presume that all matters which transpire within a government office are of public

concern would mean that virtually every remark-and certainly every criticism directed at a public official-would plant the seed of a constitutional case. While as a matter of good judgment, public officials should be receptive to constructive criticism offered by their employees, the First Amendment does not require a public office to be run as a roundtable for employee complaints over internal office affairs.

*Connick v. Myers*, 461 U.S. 138, 149, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983).

The *Kurtz* case can be distinguished insofar as the court concluded that the professor's criticism could be characterized as an accusation as to the university's "breach of public trust." *Kurtz*, 855 F.2d at 728. Mack, on the other hand, was directly involved in issues of public trust and her "positions" merely concerned the appropriate manner in which to deal with the relevant issues. As a high-ranking public official, every aspect of her job touched on the public interest, so in these instances, the court concludes that, rather than speaking on "behalf of the public as a citizen," Mack merely "spoke for herself as an employee." *Morgan*, 6 F.3d at 754. Accordingly, Mack's internal grievances do not qualify as the type of speech protected by the present analysis, and the present analysis proceeds only on the exchange regarding the proposed legislation.

The court cannot imagine how Defendants' interest in an efficient workplace could outweigh Mack's interest in responding to legislation specifically aimed at her, nor do Defendants offer any suggestions in this regard. As such, the court will conclude that her First Amendment interests are sufficiently weighty and will proceed to examine whether their exercise played a "substantial" part in her termination. Mack's first shortcoming is the serious doubt as to whether the individual Defendants had any knowledge of her complaint to Petelos. Indeed, as Defendants point out, Fuller was not the ADHR Director at this time, Flowers was not involved in Mack's termination, and the State Board members have been shown to have no involvement beyond upholding the termination on appeal. (Mot. at 21.) Moreover, the complaints were in February of 1998 (Mot.Ex. 12), some eighteen months before

the town hall meeting was called. It is true that "these gaps of time, standing alone, do not preclude [Mack] from producing enough evidence for a reasonable jury to conclude that protected speech was a substantial factor in the decision to terminate [her]." *Beckwith v. City of Daytona Beach Shores*, 58 F.3d 1554, 1567 (11th Cir.1995) (holding that fifteen months did not preclude a nexus finding). However, it is also true that Mack has presented no evidence to give rise to an inference that Defendants ever contemplated her exchange with Petelos as they took the steps leading to her termination, let alone that it was a substantial factor behind their motivations.[10] Therefore, the court has no choice but to grant summary judgment as to Mack's First Amendment claim of retaliation.

### 4. Procedural Due Process

To the extent that the statutes of Alabama create a property interest in continuing public employment, said interest may not be taken without complying with the requirements of the Due Process Clause. *Bd. of Regents v. Roth*, 408 U.S. 564, 576–78, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). The parties do not contest that Mack held such a property interest, but merely whether its taking complied with Due Process. Mack argues that her termination proceedings were deficient in several respects. First, she alleges that the charges were vague and general thereby giving her no opportunity to adequately prepare her defense to said charges. Additionally, she contests that she was subjected to the undue burden of parsing through thousands of pages of evidence to uncover the truth as to such charges. Finally, Mack avers that Chief ALJ Meadows was biased,

---

**10.** Even if she had presented such evidence, the court is confident that the numerous "legitimate, nondiscriminatory reasons" discussed in the context of Mack's Title VII claims would serve to diminish its significance so as to make summary judgment proper.

thereby irreparably tainting all subsequent proceedings. The only means of remedying the problem, she suggests, is for the case to be "returned to the state agencies involved so that it can be heard over again" with her being reinstated as PCDHR Director in the interim. (Resp. at 11.) For the following reasons, the court disagrees with Mack's arguments.

"The essential requirements of due process ... are notice and an opportunity to respond." *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 546, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985). This rule translates into termination proceedings as entitling a tenured public employee "to oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story." *Id.* No more than this is required, for it would disrupt the delicate balance which this requirement strikes between the employee's property interest and "the government's interest in quickly removing an unsatisfactory employee." *Id.*

 Mack does not deny that she was given notice, she merely challenges the sufficiency thereof. She argues that the charges against her were so ambiguous that she was denied the opportunity to effectively defend herself against them. The court agrees that an employee who has merely been accused of possessing a "management style [that is] heavy handed, vindictive, and punitive" will encounter grave difficulty as she attempts to surmise what alleged wrongdoings lay at the basis of this accusation. (Mot.Ex. 4.) While this is the most blatant example of the charges' ambiguity, it is noteworthy that the state court judges were reluctant about allowing the termination hearings to proceed as the charges stood. In the absence of more evidence on the record, the court might be inclined to grant the relief sought. However, the court believes that the post-ter-

mination proceedings adequately remedied such defects.

After the County Board adopted the recommendation of ALJ Long, Mack appealed her matter to the State Board wherein she offered the same Due Process challenges as made in the present complaint. Recognizing the merit to such a challenge, Chief ALJ Meadows required Defendants to amend the charges with greater specificity. At this point, Mack was provided a de novo hearing. The consequence is that she was fully aware of the substance of the charges, as well as the nature and source of all evidence to be presented against her. The court agrees that the matter would have operated more efficiently had the charges been stated with more particularity from the outset, but the adequacy of the post-deprivation hearing prevents the court from finding a due process violation. *See Wallace v. City of Montgomery*, 956 F.Supp. 965, 980–81 (M.D.Ala.1996); *see also McKinney v. Pate*, 20 F.3d 1550, 1561–65 (11th Cir.1994) (observing that the fact that Florida statutes offered a review procedure for pre-termination hearings satisfied procedural due process absent a showing that such processes themselves were inadequate).

Mack seeks reliance upon the Supreme Court's decision in *In re Ruffalo*, 390 U.S. 544, 88 S.Ct. 1222, 20 L.Ed.2d 117 (1968), for the proposition that the later clarification of the charges against her could not overcome the taint already instilled by the prior proceedings. The *Ruffalo* Court held that the Due Process Clause prohibited the disbarment of a lawyer who was not given notice that a determination on his employment status would also influence his bar membership until after he had testified frankly as to the employment charges. *Id.* at 550–51, 88 S.Ct. 1222. The *Ruffalo* case can be distinguished from the present matter insofar as the evidence in that case was applied to a new charge against which the

defendant had no opportunity to prepare a defense. Although the charges against Mack were clarified on the basis of certain evidence, this evidence was never applied to the amended charges; Mack received a *de novo* post-termination hearing.[11] Mack had adequate opportunity to prepare a defense against these newly amended charges given her familiarity with the evidence to be used, the specificity of the charges, and Defendants' unambiguously expressed intention that termination was sought.[12]

Mack also alleges bias on the part of Chief ALJ Meadows, thereby calling into question the validity of even the post-termination proceedings. Mack alleges that in the course of the pre-termination hearing Chief ALJ Meadows admonished one of Mack's witnesses for "being cute" with her answers. (Post-termination Transcript at 1576.) Another witness he accused of "watching too much television with lawyer shows." (*Id.* at 2120.) He also made a comment as to the overall shoddiness of the PCDHR administration by referring to one of Mack's witnesses as a "fool supervisor." (*Id.* at 609.) These are apparently the strongest examples of bias, although Mack also directs the court to forty-eight other examples which alleg-

edly give "ample reason to believe that [Chief ALJ Meadows] had pre-judged the case." (Resp. at 13.)

■ Even were the court to grant that the colorful comments, when viewed as a whole, raised a jury question as to the issue of bias, summary judgment would be appropriate nonetheless. The Eleventh Circuit has held that, proof that a decision-maker was biased "is not tantamount to a demonstration that there has been a denial of procedural due process." *McKinney*, 20 F.3d at 1562. "[P]rocedural due process violations do not become complete 'unless and until the state refuses to provide due process.'" *Id.* (quoting *Zinermon v. Burch*, 494 U.S. 113, 123, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990)). In other words, "even if [Mack] suffered a procedural *deprivation* at the hands of a biased [ALJ] at [her] termination hearing, [she] has not suffered a *violation* of [her] procedural due process rights unless and until the State of [Alabama] refuses to make available a means to remedy the deprivation." *Id.* at 1563 (emphasis in original).

As Plaintiff's counsel is fully aware, Alabama provides a mechanism for its civil court system to review such administrative decisions for bias.[13] Ala.Code § 41–22–20

**11.** Moreover, the court finds that, for purposes of procedural due process, a distinction can be drawn between a post-hearing clarification of an ambiguous charge and the outright addition of a new charge in light of the evidence. The contours of this distinction need no elaboration as the significant fact in the present matter is that the evidence driving such an amendment was never applied to the clarified charges.

**12.** The court sympathizes with the "trauma" experienced by Mack's counsel "in trying to sift through" thousands of pages of transcripts to prepare for the appeal, but it does not believe such an experience implicates due process concerns. (Resp. at 10.) Aside from the apparent contradiction between the respective complaints of inadequate notice and one of too much evidence, it is noteworthy

that more than half of the testimony making up these transcripts was offered either by Mack's witnesses (See Pre–Termination Transcript at 2119–2756, 3089–3470, 3590–4073, 4134–4502), or by witnesses she called to the stand to cross-examine for a second time. (*Id.* at 2757–3088, 3471–3589, 4074–4133.) Regardless, the court is unaware of any case-law supporting the proposition that a due process violation results from too much evidence on the record. Nor can it conceive of a rationale for such a conclusion.

**13.** In his request that Chief ALJ Meadows recuse himself on the grounds of bias, Plaintiff's counsel boasted of his success in *State Tenure Commission v. Page*, 777 So.2d 126 (Ala.Civ.App.2000), wherein he persuaded the judges to overturn an administrative ruling on

(1975). Indeed, an action is presently pending in the Circuit Court of Montgomery County, wherein Mack seeks review of her termination proceedings. Mack's day in court has not yet come to a close, except insofar as the present forum is concerned. The State of Alabama had given her a property interest in continued employment, and the State of Alabama took it away. On the propriety thereof, the court says no more. Summary judgment is due to be granted on Mack's due process claim.

## V. ORDER

Based on the foregoing, it is CONSIDERED and ORDERED that Defendants' Motion For Summary Judgment be and the same is hereby GRANTED. A judgment in accordance with this Memorandum Opinion and Order shall be entered separately.

the grounds of bias. (Post-termination Transcript at 2069–70.)